**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GREEN OCEANS, a Rhode Island non-profit corporation, P.O. Box 976, Little Compton, RI 02837; ELIZABETH QUATTROCKI KNIGHT, MD, PHD, 504 Concord Avenue, Belmont, MA 02478; CHRIS BROWN, an individual, 290 Columbia St, Wakefield, RI 02879; KEVIN DEBBIS, an individual, 1616 old Colchester Rd., Oakdale, CT 06370; RICH HITTINGER, an individual, 326 Thames Avenue, Warwick, RI 02886; ELIZABETH VITTON, an individual, 325 Ocean Drive, Newport, Rhode Island 02840; SANDRA CRAIG, an individual, Stonybrook House, 501 Indian Avenue, Middletown, RI 02842; WAMPANOAG TRIBE OF GAY HEAD – AQUINNAH, a federally recognized Indian Tribe, 20 Black Brook Rd, Aquinnah, MA 02535; NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION, a Maine non-profit corporation 14 Old Town Road Orris Island, ME 04066; NARRAGANSETT INDIAN TRIBE, 4533 South County Trail Charlestown, RI 02813 | |
| *Plaintiffs*, | Case No. |
| v. | Judge |
| BUREAU OF OCEAN ENERGY MANAGEMENT, 1849 C Street NW, Washington, DC 20240; MATTHEW GIACONA, in his official capacity as the Director of the Bureau of Ocean Energy Management, 1849 C Street NW, Washington, DC 20240; US DEPARTMENT OF INTERIOR, 1849 C Street NW, Washington, DC 20240; DOUG BURGUM, in his official capacity as the Secretary of the Interior, 1849 C Street NW, Washington, DC 20240, | |
| *Defendants* | |

1

**Complaint For Declaratory and Injunctive Relief To Set Aside Final Agency Action**

Plaintiffs GREEN OCEANS; ELIZABETH QUATTROCKI KNIGHT, MD, PHD; CHRIS BROWN, KEVIN DEBBIS, RICH HITTINGER, WAMPANOAG TRIBE OF GAY HEAD – AQUINNAH, ELIZABETH VITTON, NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION, SANDRA CRAIG, and NARRAGANSETT INDIAN TRIBE ("Plaintiffs"), by their attorney file this Complaint against Defendants BUREAU OF OCEAN ENERGY MANAGEMENT; Director of the Bureau of Ocean Energy Management, MATTHEW GIACONA; U.S. DEPARTMENT OF INTERIOR; and, DOUG BURGUM, Secretary of the Interior, and allege the following.

**Nature of the Action**

1. This is an action for declaratory and injunctive relief challenging the Bureau of Ocean Energy Management's ("BOEM") approval of the Sunrise Wind offshore wind project ("Sunrise Wind") as contrary to the Outer Continental Shelf Lands Act ("OCSLA"), the National Environmental Policy Act ("NEPA"), the National Historic Preservation Act ("NHPA"), and the Administrative Procedure Act ("APA"). Plaintiffs seek orders vacating and setting aside as unlawful the Record of Decision ("ROD") and Construction and Operations Plan ("COP") approving Sunrise Wind. BOEM is also engaging in ongoing violations of OCSLA because it continues to allow Sunrise Wind to proceed under approvals that were issued using an interpretation of OCSLA § 8(p)(4), 43 U.S.C. § 1337(p)(4), that the Department of the Interior has since withdrawn as erroneous.

2. In this suit, Plaintiffs ask this Court to invalidate the putative approvals of the Sunrise Wind until and unless the Federal Government complies with the relevant statutes and

regulations. In the alternative, Plaintiffs request that this Court remand the ROD and COP to BOEM for reconsideration consistent with the proper interpretation of OCSLA.

3.     In all of the allegations, *infra*, Plaintiffs incorporate by reference all contents of their Notice of Intent to Sue under the OCSLA of December 18, 2025.

**Jurisdiction and Venue**

4.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal questions), 28 U.S.C. § 1346 (United States as defendant), 28 U.S.C. § 2201 (declaratory judgment),  28 U.S.C. § 2202 (injunctive relief), 43 U.S.C. § 1331 et seq. (OCSLA), 54 U.S.C. § 300101 et seq. (NHPA), 42 USCS § 4321 et seq. (NEPA), and 5 U.S.C. § 701 through 706 (APA).

5.     Final agency decisions are subject to judicial review (here, ROD and COP approval). This action is timely under 42 U.S.C. § 4370m-6(a)(1)(A). The Federal Register notice of the Record of Decision for the Sunrise Wind Project was published on March 29, 2024. This complaint is filed within two years of that publication. To the extent any claim is governed by the six-year limitations period of 28 U.S.C. § 2401, that period has likewise not expired. Plaintiffs have met all applicable statutes of limitation.

6.     Pursuant to 43 USCS § 1349(a), on December 18, 2025, Plaintiffs sent a notice of intent ("NOI") to sue to BOEM over its ongoing violations of OCSLA.

7.     Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e)  because all of the Federal Defendants reside in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

**Parties**

8.     Plaintiff ELIZABETH (LISA) QUATTROCKI KNIGHT, M.D., Ph.D., is co-

founder and President of Green Oceans and a resident of Little Compton, Rhode Island. She is an avid boater who regularly uses the coastal waters within the broader marine environment affected by the Sunrise Wind Project's lease area for boating, wildlife observations, aesthetic pleasure in the natural habitat, and for her scientific interests in marine mammals. During these trips, Dr. Knight watches marine life, including dolphins and the endangered North Atlantic Right Whale, and intends to continue doing so in the future. The Sunrise Wind Project has impaired and will continue to impair her use and enjoyment of these waters by displacing marine mammals, reducing her opportunities to observe them, and degrading the natural marine environment she regularly experiences. The Project has substantially increased large vessel traffic in the waters she regularly uses, creating hazards that have forced Dr. Knight to alter her boating routes and reduce the frequency of her trips. The presence of obtrusive structures and industrial vessels diminish her recreational, aesthetic, and scientific interests in observing marine ecosystems in their natural state.

9.      Dr. Knight has suffered additional concrete and ongoing injuries as a direct result of the Project and adjacent offshore wind construction activities. Turbine blade debris from the catastrophic blade failure at Vineyard Wind 1 on July 13, 2024 washed ashore on her private coastal property on August 25, 2024, more than a month later, contaminating it with toxic composite materials contained in the blade. Dr. Knight notified the Project developer of the presence of blade debris on her property via the published hotline number. The developer did not respond to that notification. The contamination of her property therefore remains un-remediated to this day. At the end of the summer, Dr. Knight participated in a subsequent community beach cleanup effort and collected additional blade debris, demonstrating the persistent and ongoing nature of this contamination. Photographic documentation of the debris on her property is in her possession. Dr. Knight's property lies within the debris dispersal corridor of the Sunrise Wind lease

4

area. BOEM approved Sunrise Wind without requiring any project-specific blade failure prevention, containment, monitoring, or response protocol. Blade failure is not a manufacturer-specific defect — it is an industry-wide, documented risk. Industry data establishes that approximately 3,800 blade failures occur annually across the global fleet, making blade failure the leading cause of insurance claims in the U.S. wind energy market regardless of turbine manufacturer.[1] This statistic covers both onshore and offshore turbines and includes not just catastrophic failures, but highlights that the industry knew blade failure was a risk. BOEM should have as well.

10.     Dr. Knight is a board-certified psychiatrist and earned a PhD in neuroscience. She has published on the neurobiological basis of empathy.[2] Her scientific interest in empathy has led her to write about the neurological basis of empathy in whales.[3] During the summer following the commencement of pile driving for the Revolution Wind and Sunrise Wind projects, a minke whale stranded and died on the beach associated with Dr. Knight's property — an event that long-time residents confirmed had never previously occurred within their collective memory of approximately thirty years, and that caused significant distress to Dr. Knight and her neighbors. Photographic documentation is in her possession. The Sunrise Wind Project's approved Cooling Water Intake Structure will destroy over one billion Calanus finmarchicus annually — the primary prey species of the North Atlantic Right Whale. This ongoing destruction of the prey base of a species in which Dr. Knight has a documented scientific and personal interest, in the

---

[1] Shaun Campbell, Annual Blade Failures Estimated at Around 3,800, WINDPOWER MONTHLY (May 14, 2015), https://www.windpowermonthly.com/article/1347145/annual-blade-failures-estimated-around-3800.

[2] Quattrocki, E. and Friston, K.J., "Autism, oxytocin, and interoception." Neuroscience and Biobehavioral Reviews, 2014.

[3] Quattrocki Knight, "Whales and Empathy," 2025. https://www.green-oceans.org/our-information-archive/whales-and-empathy?rq=Empathy

specific waters she regularly uses, constitutes a concrete and particularized injury to her recreational, aesthetic, and intellectual interests that is directly traceable to BOEM's approval of the Project and would be redressed by the relief sought.

11. On behalf of Green Oceans and herself, Dr. Knight submitted comments on the Sunrise Wind Draft Environmental Impact Statement (BOEM-2022-0071-0232) and the Incidental Take Requests for the Sunrise Wind project (NOAA-NMFS-2023-0012-0581), and submitted separate comments directly to BOEM's Section 106 consultation officers on December 4, 2023, raising specific concerns about adverse effects on historic properties.  She resides on Warren's Point Road, adjacent to the Warren's Point Historic district identified by BOEM as an area impacted by the project. She has both professional and personal interests in the protection of marine ecosystems and historic coastal landscapes. Her injuries establish standing under all three causes of action: under OCSLA, through the aesthetic, recreational, and scientific harms to her use of affected waters described above, and through her role as President of Green Oceans; under NEPA, through her authorship of and participation in the DEIS and ITR comment processes; and under NHPA, through her participation in the Section 106 consultation as a resident of Little Compton within the Area of Potential Effects and her documented personal attachment to the historic coastal landscapes adversely affected by the Project. Her injuries are concrete and ongoing, directly traceable to Defendants' approval of the Project, and would be redressed by the relief sought.

12. Plaintiff GREEN OCEANS is a Rhode Island-based nonpartisan non-profit, 501(c)(3) corporation comprised of citizens dedicated to protecting the ocean, from the smallest plankton to the largest whale, and the coastal communities that rely on ocean resources. Green

Oceans believes that "protecting the ocean and biodiversity ensures our own survival"[4] and that "a healthy ocean is our best defenses against climate change." Id. Green Oceans aims to prevent irreversible damage to the marine ecosystem, seafood harvesting and safety, and coastal communities and dedicates substantial resources to educating the public about risks to the ocean and advocating for government transparency regarding the unknown risks and unproven benefits of large-scale offshore energy development. BOEM's approval of the Project directly injures Green Oceans and its members by frustrating the organization's core purpose in protecting ocean biodiversity and health. Green Oceans has repeatedly demonstrated its concrete interest in the specific resources affected by the Project area. On October 26, 2023, Green Oceans submitted 1,526 signatures to the National Oceanic and Atmospheric Administration ("NOAA") supporting the designation of Cox Ledge, a region adjacent to and affected by The Project, as a Habitat Area of Particular Concern. Green Oceans also submitted comments on the Sunrise Wind Draft Environmental Impact Statement (DEIS) (BOEM-2022-0071-0232), the Draft Strategy for the North Atlantic Right Whale (BOEM-2022-0066), and multiple Incidental Take Requests for various projects, including the Sunrise Wind Project (NMFS-2023-0012-0581). These activities establish Green Oceans' standing under all three causes of action: OCSLA and NEPA through its members' use of and injuries to the affected marine environment and its authorship of comments in the administrative record; NHPA through its members' interests in the historic coastal landscapes within the Area of Potential Effects.

13.    BOEM's approval of the Project's Cooling Water Intake Structure constitutes a particularly direct injury to Green Oceans' organizational mission and its members. Green Oceans was founded on the principle that protecting ocean biodiversity — from the smallest plankton to

---

[4] https://www.green-oceans.org/

the largest whale — ensures the survival of the marine ecosystem on which coastal communities depend. The CWIS approved for the Sunrise Wind Offshore Converter Station will destroy over 8 billion zooplankton annually, including over one billion Calanus finmarchicus — the planktonic copepod that constitutes the primary prey of the North Atlantic Right Whale — along with approximately 2.9 million fish larvae and 29.4 million fish eggs annually, including larvae of Atlantic cod, Atlantic herring, pollock, and other species of ecological and commercial significance. This is not a generalized or attenuated harm to Green Oceans' interests. The CWIS targets for destruction the precise organisms — from the smallest plankton to the foundational prey of the largest whales — that Green Oceans exists to protect. An agency approval that targets for continuous destruction the exact organisms an organization exists to protect injures that organization as directly as any federal action can. BOEM's approval of this structure, without independent ecological review, without requiring alternatives to open-loop cooling, and without assessing cumulative entrainment impacts, directly frustrates Green Oceans' core organizational purpose of preventing irreversible damage to the marine ecosystem and biodiversity of the waters its members use, enjoy, and depend upon. Green Oceans has dedicated substantial organizational resources — including staff time, scientific review, and public advocacy — to opposing the approval of structures that cause precisely this type of irreversible biodiversity harm. The CWIS approval has required Green Oceans to divert organizational resources from other programs to address this specific threat, constituting organizational injury in its own right.

14.    Plaintiff Green Oceans has associational standing to bring this action on behalf of its members. First, at least one Green Oceans member, Plaintiff Elizabeth Knight, M.D., Ph.D., its co-founder and President, has standing to sue in her own right, as set forth *supra.* Additional Green Oceans members who have standing in their own right and whose injuries are described below

include Plaintiffs Rich Hittinger, Chris Brown, Kevin Debbis, Sandra Craig, and Elizabeth Vitton. Second, the interests Green Oceans seeks to vindicate in this action: the protection of ocean biodiversity, marine ecosystems, and coastal communities from the adverse environmental, navigational, and national security consequences of BOEM's unlawful approval of Sunrise Wind, are directly germane to Green Oceans' organizational purpose of combating industrialization of the ocean and safeguarding marine biodiversity. Third, neither the claims asserted nor the relief requested require the individual participation of Green Oceans' members. The claims are purely legal and administrative in nature and can be litigated by counsel on behalf of the organization and its members.

15.    Plaintiff CHRIS BROWN is a commercial fisherman and owner-captain of two vessels based out of Point Judith, Rhode Island, who has been fishing in the waters between Block Island and Martha's Vineyard, the precise location of the Sunrise Wind lease area, for decades (since 1976). He is a member of Green Oceans. One of his most productive areas is Coxes Ledge and the surrounding areas, which directly overlap with Sunrise Wind's lease area. Construction and operation of Sunrise Wind have already caused and will continue to cause devastating harm to his commercial fishing operation, including but not limited to killing fish eggs, and drastically reducing the population of fish in his primary fishing grounds. Sunrise Wind's impacts on the cod stock have already and will further severely limit his fishing capabilities and frustrate his ability to earn a living from fishing. He, along with every other Atlantic cod fisher, limited to a certain number of cod catches each year because Atlantic cod are a federally managed stock. When he has caught his quota, he is prohibited from catching any additional cod. As the number of available cod in his fishing areas decreases—which has occurred due to Sunrise Wind's construction activities in cod spawning areas, the number he is allotted each year will decrease. When this

number decreases, he will have less opportunities to fish in certain areas—areas he has fished in for decades—for fear of catching cod and going above his quota. Any reductions in catch share will have a limiting influence on how he fishes and with less opportunities to fish for cod, the less money he is able to generate. As such, Plaintiff Brown is and will continue to be economically harmed by way of Sunrise Wind. The Sunrise Wind Offshore Converter Station's Cooling Water Intake Structure will continuously destroy 2.9 million fish larvae and 29.4 million fish eggs annually — including larvae of Atlantic cod and other commercially significant species — in the precise waters where Mr. Brown has fished for decades. This ongoing, daily destruction of fish early life stages in his primary fishing grounds will directly reduce the abundance of the commercially significant species on which his livelihood depends, further depressing his catch and compounding the quota limitations he already faces. A favorable Court decision will redress this harm caused by Sunrise Wind. As such, this harm confers standing for OCSLA, principally through Plaintiff Brown's economic harm. The physical obstruction of the agency sanctioned Sunrise Wind project destructively interferes and impairs Plaintiff Brown's ability to adequately fish. As a direct result of the federal agencies' approvals of Sunrise Wind, Plaintiff Brown is suffering harm under OCSLA (and his harms fall squarely within the zone of interests of that statute), traceable to the agencies' sanctioned activities of Sunrise Wind, and redressable by this Court.

16.     Plaintiff KEVIN DEBBIS is a commercial fisherman based out of Oakdale, Connecticut and is a member of Green Oceans. He has been fishing in the waters of southern New England off Connecticut, Rhode Island and Massachusetts for over 30 years. He has been captaining commercial fishing vessels since 1995. Currently, he is the owner and captain of F/V Lin Marie and F/V Donna Marie. He has been fishing in the area between Block Island, Rhode Island and Martha's Vineyard, Massachusetts, where the Sunrise Wind Project is being built, for

decades. This location has historically been abundant because it is positioned between Mid-Atlantic fishing waters and northern fishing waters. He fishes for Atlantic sea scallops, squid, scup, flounder and fluke. One of the most productive areas where he fishes is on the outskirts of Cox Ledge and in Sunrise Wind's lease area, which overlaps with Cox Ledge. Cox Ledge is an area of hard bottom, diverse habitat between Martha's Vineyard and Block Island. Cox Ledge, and the area where Sunrise Wind Project is being built, is the most important resource fishermen have in southern New England, and it is a habitat and spawning ground for many marine species necessary for his commercial fishing business. His traditional trawling grounds have been destroyed and these obstacles put his crew and boat at a significant risk, since his net could easily become snagged or entangled in the Project. The Sunrise Wind Project is a navigational and safety hazard, which has extremely limited his ability to utilize his traditional fishing grounds. The construction and operation of Sunrise Wind have, and will continue to have, a devastating impact on his commercial fishing operation. He will not be able to fish in the Sunrise Wind area anymore because doing so would be unprofitable and dangerous based on his knowledge of the conditions. In all, the Sunrise Wind project has and will have dire consequences for commercial fishermen like Plaintiff Debbis. As a direct result of the federal agencies' approvals of Sunrise Wind, Plaintiff Debbis is suffering harm under OCSLA (and his harms fall squarely within the zone of interests of that statute), traceable to the agencies' sanctioned activities of Sunrise Wind, and redressable by this Court.

17.    Plaintiff RICH HITTINGER is a recreational fisherman in Rhode Island. For more than 50 years, he has fished the Rhode Island Sound, the area of Cox Ledge, and the area where the Sunrise Wind Project is now being built. He is a member of Green Oceans. He has primarily fished the area recreationally. He helped draft the Rhode Island Ocean Special Area Management Plan chapter on fishing and fisheries and served on Rhode Island's Coastal Resource Management

Council's (CRMC) Fisheries Advisory Board for many years until his resignation in August 2023 following the approval of Revolution Wind, South Fork Wind, and Sunrise Wind. He resigned along with each of the other members of the Advisory Board because they felt that the CRMC was no longer following Rhode Island law and was actively approving and condoning the destruction of the ocean and disregarding the Board's advice and expert opinions. During the Summer of 2023, he personally visited the area of the South Fork Wind Project, which is adjacent to the Sunrise Wind Project and is also being built on Cox Ledge. He tried fishing at some of his previously productive spots near the project but found that there were no cod or sea bass close to the turbines. During the Summer and Fall of 2024 he observed that fishing for bottom fish such as black sea bass, cod, fluke and others has been the worst that he has ever experienced in the areas near the Sunrise Wind construction area. The South Fork Project and now the Sunrise Wind project have already interrupted his fishing ability in this area. Once all of Sunrise Wind's turbines are built, his ability to fish in and around Cox Ledge and the Sunrise Wind lease area will be completely ruined and the area will not only be unproductive for fishing, but will be incredibly dangerous for navigation during reduced visibility times. Fishing in and near Sunrise Wind's lease area will never be the same, as construction has already started. As more turbines are installed, the degradation of the area and of Cox Ledge becomes more significant, and the effects will never be reversed. The cumulative effect of South Fork, Revolution Wind, and Sunrise Wind—as well as the other Projects on the East Coast—will become much more significant over time, reducing productivity and limiting recreational fishermen like him from fishing in the area. As a direct result of the federal agencies' approvals of Sunrise Wind, Plaintiff Hittinger is suffering harm under OCSLA through the destruction of recreational fishing grounds he has used for over fifty years and the permanent degradation of Cox Ledge, (and his harms fall squarely within the zone of interests of that statute),

12

traceable to the agencies' sanctioned activities of Sunrise Wind, and redressable by this Court.

18.    Plaintiff NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION is a bipartisan, non-profit organization committed to uniting Americans in the fight to preserve what could be the last wild frontier: the ocean, where fresh, wild, protein-rich American seafood that nourishes our nation is harvested. They are an alliance of the wild harvesters of the waters off of New England, dedicated to educating the public about how best to manage our seafood resources through sound science and best practices of conservation used by fishermen, with a view toward economic well-being, ecosystem sustainability, and US food security.

19.    Mr. Malone captains the FV Susan C out of Stonington, CT. He is a member of NEFSA and has fished commercially to support himself and his family for over twenty years, owning and operating Santana Fishing LLC. Historically he has trawled for a variety of species (skate, summer flounder, loligo squid, winter flounder) in the Sunrise Wind lease area and the region that now houses the high voltage export cable. He can no longer fish in this area due to the significant danger of gear entanglement. If his trawler accidentally catches on the exposed areas of a cable, or concrete mattress, the force will flip his boat. Such an accident risks injury, destruction of property, and even death.  This risk extends beyond the area of the export cables to include the entire lease area due to the extensive web of inter-array cables (over 280 linear miles). His catch has decreased since the onset of construction. He will now no longer be able to trawl in his traditional fishing grounds. The millions of fish larvae and tens of millions of fish eggs destroyed annually by the Cooling Water Intake Structure will reduce his livelihood even further. The Project's destruction of his traditional trawling grounds, interference with his commercial fishing operations, and creation of navigational hazards have displaced him from the waters he has worked for decades. Finding new fishing grounds will require longer travel

13

distances, which increases risks and consumes more for fuel. His injuries are directly traceable to BOEM's approval of the Project and would be redressed by the relief sought.

20. Plaintiff New England Fishermen's Stewardship Association has associational standing to bring this action on behalf of its members. First, at least one NEFSA members, Daniel E. Malone, has standing to sue in his own right, as set forth *supra*. Other NEFSA members who fish or have fished in the Project area have suffered materially similar economic and safety harms. Second, the interests NEFSA seeks to protect in this action, the preservation of wild-harvest fishing grounds, the conservation of marine resources through sound science, and the prevention of interference with the reasonable use of New England's offshore waters by commercial fishermen, are directly germane to NEFSA's purpose of uniting and advocating for wild harvesters of New England's waters and promoting economically and ecologically sound ocean stewardship. Third, neither the claims asserted nor the relief requested, require the individual participation of NEFSA's members in the litigation; the claims are legal and administrative in nature and are fully capable of resolution by counsel on behalf of the association.

21. Plaintiff ELIZABETH VITTON, an individual plaintiff and owner of a historic property known as "Indian Spring," located within the Ocean Drive Historic District in Newport, Rhode Island. Ms. Vitton is a member of Green Oceans. The Ocean Drive Historic District was designated a National Historic Landmark District in 1976, 54 U.S.C. § 302101 et seq., in recognition of its distinctive Olmsted-designed landscape and Gilded Age architecture, and separately listed on the National Register of Historic Places. Indian Spring is a contributing resource within that NHL District. Ms. Vitton has suffered concrete, particularized, and ongoing injuries as a direct result of Defendants' approval of the Sunrise Wind Project. Indian Spring is a

14

historically significant oceanfront property whose architectural and cultural value is inextricably tied to its unobstructed ocean viewshed, which has remained intact since its construction in the late nineteenth century. The Sunrise Wind Project's turbines, aviation and navigational lighting, and associated offshore infrastructure are visible from Ms. Vitton's property and materially degrade this historic viewshed, thereby causing an adverse effect on the integrity of the property and its setting within the meaning of 36 C.F.R. § 800.5. These impacts impair her aesthetic and cultural enjoyment of the property, diminish its historic integrity and economic value, and adversely affect the character and significance of the Ocean Drive Historic District, of which her property is a contributing resource. Although other offshore wind projects, including Revolution Wind, have already partially intruded upon the historic viewshed, the Sunrise Wind Project will add additional turbines, lighting, and visual clutter, resulting in cumulative and incremental adverse effects that further degrade the integrity of the historic setting. The fact that prior projects have already impacted the viewshed does not diminish the additional, project-specific harm caused by Sunrise Wind. Ms. Vitton participated as a consulting party in the Section 106 process for the Sunrise Wind Project and submitted specific objections regarding adverse effects to Indian Spring and the Ocean Drive National Historic Landmark District. BOEM received and acknowledged her participation but did not meaningfully consider, respond to, or incorporate her objections into its adverse effects determination or the mitigation measures adopted in the Memorandum of Agreement. This failure to give good faith consideration to a consulting party's substantive objections — as distinct from mere notice failures — violates 36 C.F.R. § 800.6(a).

22.    Plaintiff SANDRA CRAIG, as Trustee of the Veter et Nova Trust and owner of the historic property known as "Stonybrook," located at 501 Indian Avenue in Middletown, Rhode Island within the Stonybrook Estate Historic District—a property and district listed on the National

Register of Historic Places—has suffered concrete, particularized, and ongoing injuries as a direct result of Defendants' approval of the Sunrise Wind Project. Stonybrook is a historically significant oceanfront estate whose architectural integrity, setting, and cultural value are inextricably tied to its unobstructed, panoramic ocean viewshed, which has remained intact since its construction in the early twentieth century. The Sunrise Wind Project's turbines, aviation and navigational lighting, and associated offshore infrastructure are visible from Stonybrook and materially degrade this historic viewshed, thereby causing an adverse effect on the integrity of the property and its setting within the meaning of 36 C.F.R. § 800.5. These impacts impair Ms. Craig's aesthetic, recreational, and cultural enjoyment of the property, diminish its historic integrity and economic value, and adversely affect the character and significance of the Stonybrook Estate Historic District, of which the property is a central contributing resource. Although other offshore wind projects, including South Fork Wind and Revolution Wind, have already intruded upon the historic viewshed, the Sunrise Wind Project will introduce additional turbines, lighting, and visual clutter, resulting in cumulative and incremental adverse effects that further degrade the integrity of the historic setting. The existence of prior impacts does not diminish the additional, project-specific harm caused by Sunrise Wind. Ms. Craig participated as a consulting party in the Section 106 process for the Sunrise Wind Project and submitted specific objections regarding adverse effects to Stonybrook and the Stonybrook Estate Historic District. BOEM received and acknowledged her participation but did not meaningfully consider, respond to, or incorporate her objections into its adverse effects determination or the mitigation measures adopted in the Memorandum of Agreement. This failure to give good faith consideration to a consulting party's substantive objections violates 36 C.F.R. § 800.6(a) and constitutes a procedural injury that is distinct from, and not addressed by, any notice-based holding. Her injuries are concrete, ongoing, directly

16

traceable to Defendants' actions, and would be redressed by the relief sought. BOEM failed to take adequate account of adverse effects to Stonybrook and the Stonybrook Estate Historic District, ensure meaningful public participation in the Section 106 consultation process, and arbitrarily concluded that adverse effects were resolved consistent with 36 C.F.R. § 800.6.

23. Plaintiff NARRAGANSETT INDIAN TRIBE is a federally recognized Indian tribe, the successor in interest to the Great Algonquian Nation, one of the First Contact Tribes of the United States, with longstanding ancestral, cultural, spiritual, historical, and continuing ties to the lands and waters of present-day Rhode Island, Narragansett Bay, Block Island Sound, and the adjacent Atlantic Ocean. Anthony Dean Stanton is Chief Sachem of the Narragansett Nation. The Tribe itself continues to maintain an active and ongoing relationship with these coastal and marine areas through its cultural, ceremonial, educational, and community life. The ocean horizon, open coastal viewshed, and marine environment in the area affected by Sunrise Wind are integral to the Tribe's cultural landscape, traditions, identity, and continuing relationship to its ancestral homeland. The Tribe's cultural and ceremonial practices, intergenerational teaching, and collective connection to place are bound up with the continued integrity of these waters and seascapes. Defendants' approval of Sunrise Wind injures the Narragansett Indian Tribe itself by industrializing and degrading a seascape of ongoing cultural, spiritual, ceremonial, and educational importance to the Tribe; interfering with the Tribe's continued relationship to these ancestral waters; diminishing the Tribe's use and enjoyment of the affected coastal and marine environment; and impairing the Tribe's interest in preserving and maintaining the integrity of its cultural landscape for present and future generations. Sunrise Wind also threatens marine resources and the surrounding ocean environment that are important to the Tribe's traditional relationship with the sea, including resources tied to Tribal observation, fishing, gathering, cultural practice, and

17

intergenerational knowledge. The Narragansett people have harvested quahog, striped bass, bluefish, and other marine species from the waters of Block Island Sound and the adjacent Atlantic Ocean since time immemorial as a vital source of nutrition, cultural identity, and intergenerational practice. Tribal members continue to fish and gather in these waters today, including in and around the areas affected by Sunrise Wind's construction and operation. The Project's destruction of benthic habitat, resuspension of toxic sediments, introduction of anti-corrosive and biofouling chemicals into the water column, and reduction of primary productivity in the affected marine ecosystem directly degrade the quality, availability, and safety of the marine resources on which Tribal members rely for subsistence and cultural practice. These harms are not speculative — construction is already underway and the degradation of traditional fishing grounds has already begun. These injuries establish standing under three causes of action: under OCSLA, through the industrialization and degradation of ancestral waters and the destruction of subsistence fishing grounds that fall squarely within the zone of interests protected by that statute; under NEPA, through the Tribe's participation in the DEIS process and BOEM's failure to take a hard look at impacts to Tribal cultural resources, subsistence fishing, and the marine ecosystem the Tribe depends upon; and, under NHPA, through the Tribe's participation as a consulting party in the Section 106 process and BOEM's failure to give good faith consideration to the Tribe's objections regarding adverse effects to its cultural landscape and ancestral waters. These injuries are concrete, particularized, and ongoing, are fairly traceable to the challenged federal approvals for Sunrise Wind, and would be redressed by the relief requested herein.

24.    Plaintiff WAMPANOAG TRIBE OF GAY HEAD – AQUINNAH is a federally recognized Indian Tribe, with its headquarters located at Aquinnah, MA on the island of Martha's Vineyard. The Chairman of the Aquinnah Wampanoag Tribe is Kevin Devine. The Wampanoag

18

Tribe of Gay Head (Aquinnah) (Aquinnah Tribe) are part of the Great Wampanoag Nation and are known as The People of the First Light. The aboriginal Wampanoag Territory homelands spans from north of current day Boston Massachusetts, westward and south to Mount Hope Bay in eastern Rhode Island, and then eastward to include southeastern Massachusetts, Cape Cod, the Elizabeth Islands, Noepe (aka Martha's Vineyard) and Nantucket, as well as the now submerged lands all the way out to the outer -continental shelf break. As the original stewards of this region; the Tribe has inhabited the lands and utilized the waters and their resources since time immemorial. They lived upon the land, practiced their traditions and culture, held ceremony and interred their People on the land that is currently dry, and the lands that are currently submerged. Within this area are an untold number of submerged archeological resources including the likelihood of ancient burials.

25.    Additionally, the unobstructed and majestic views from the south side of the island from Chappaquiddick to Aquinnah and the Aquinnah (Gay Head) Cliffs, which overlook the waters where the project is being constructed, are areas of unparalleled cultural significance to the Aquinnah Wampanoag Tribe. The unobstructed eastern view is inextricably intertwined with who they are as a People and their cosmology, essential to their spiritual beliefs and practices. And, the Sacred Aquinnah Cliffs is the only location on the island where you can view both the sunrise and sunset. In 2010, the Department of the Interior National Park Service's Keeper of the National Register designated all of Nantucket Sound and an undefined boundary as a Traditional Cultural Property, eligible for listing on the National Register of Historic Places under all four (4) Criteria. The Aquinnah (Gay Head) Cliffs are sacred to the Tribe and are also inextricably intwined with the history traditions and cosmology of their People. The Aquinnah (Gay Head) Cliffs have been listed on the National Park Service National Register of Historic Places as a Natural National

19

Landmark since 1966.

26.    Further, the North Atlantic Right Whale plays a critical role in the Tribe's cosmology. Specifically, in the Aquinnah Wampanoag Tribe oral history regarding the creation of Noepe, the North Atlantic Right Whale fed Moshup and the Wampanoag people on the Island. In fact, according to Wampanoag history, the unique colors of the Cliffs is a direct result of Moshup's use of the whale as his favorite food source. The North Atlantic Right Whale is prominently depicted in  the Tribe's logo, demonstrating its continued significance to the Tribe to this day. The CWIS will further destroy over one billion Calanus finmarchicus annually in the waters the Tribe has harvested since time immemorial. Calanus finmarchicus is the primary prey of the North Atlantic Right Whale, an animal of profound cosmological and cultural significance to the Tribe. The continuous destruction of this foundational prey species in ancestral waters, approved by BOEM without independent ecological review, constitutes an ongoing injury to the Tribe's cultural, subsistence, and spiritual relationship with the marine environment that is directly traceable to the challenged approvals.

27.    This is a region that is thus replete with cultural and historical tradition to this day. The potential adverse effects of Sunrise Wind on the unobstructed, ethereal views of the ocean, the Traditional Cultural Places, their beliefs, and natural and cultural resources, will be substantial. The Tribe was identified as a consulting party by BOEM but the adverse visual effects of the Project will result in an irretrievable, irrecoverable aesthetic, cultural, and historical diminution of value for the Tribe. Accordingly, Plaintiff AQUINNAH WAMPANOAG TRIBE will suffer harm as a result of the Project, attributable to Sunrise Wind's actions, and redressable by this Court. The Sunrise Wind project will cause substantial adverse effects on the Tribe's cultural landscape, including irretrievable harm to sacred viewsheds, disruption of marine areas containing submerged

cultural resources, and aesthetic degradation of Traditional Cultural Properties.

28. The Wampanoag Tribe of Gay Head — Aquinnah participated as a consulting party in the Section 106 process for the Sunrise Wind Project and submitted specific objections regarding adverse effects to the Aquinnah Gay Head Cliffs National Historic Landmark, the Nantucket Sound Traditional Cultural Property, submerged ancestral lands within the Project's lease area, and the Tribe's cultural landscape and cosmological relationship to the affected waters. BOEM received and acknowledged the Tribe's participation but did not meaningfully consider, respond to, or incorporate the Tribe's objections into its adverse effects determination or the Memorandum of Agreement. This failure to give good faith consideration to a consulting party's substantive objections violates 36 C.F.R. § 800.6(a). Furthermore, the Aquinnah Gay Head Cliffs are a designated National Historic Landmark, triggering BOEM's heightened obligation under Section 110(f) of the NHPA, 54 U.S.C. § 306107, to undertake to the "maximum extent possible" such planning and actions as may be necessary to minimize harm to the landmark. BOEM did not apply this standard to the Aquinnah Gay Head Cliffs NHL or to the Tribe's interests in that landmark and the surrounding Traditional Cultural Property.

29. Furthermore, the tribe's members, who regularly use the waters of the Sunrise Wind project now face increased navigation safety hazards. The navigation risks from the presence of structures, their degradation of marine radar, and the turbulence the monopiles create directly impacts both the tribe and its members. The tribe, as a sovereign nation relies on the protection of the US for its own national security. The Sunrise Wind project's potential interference with the Cape Cod Early Warning Radar System, and the many other defense related radars, directly impact the security of the tribe and its members. The Sunrise Wind turbines may also interfere with Airport Surveillance Radars, necessary for safe navigation, both on the Island and the mainland. The

Tribe's leadership and members use these airports regularly. Any greater risk to aviation safety directly impacts the tribe and its members.

30.    These injuries establish standing under three causes of action: under OCSLA, through the industrialization of submerged ancestral lands extending to the outer continental shelf break, destruction of traditional fishing and navigation waters, and interference with tribal navigation and aviation safety, all of which fall squarely within the zone of interests protected by that statute; under NEPA, through the Tribe's participation in the DEIS process and BOEM's failure to take a hard look at impacts to submerged cultural resources, Traditional Cultural Properties, and the marine ecosystem the Tribe has stewarded since time immemorial; under NHPA, through the Tribe's participation as a consulting party, BOEM's failure to give good faith consideration to the Tribe's objections, and BOEM's failure to apply the Section 110(f) heightened standard to the Aquinnah Gay Head Cliffs National Historic Landmark.

## FIRST CAUSE OF ACTION

### [Violations Of The Outer Continental Shelf Lands Act (OCSLA)—43 U.S.C. §§ 1331, Et Seq. and Administrative Procedure Act]

### A. Legal Framework: BOEM Applied the Wrong Standard

31.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

32.    Plaintiffs submitted a Notice of Intent to Sue under OCSLA 43 U.S.C. §1349(a)(1) on December 18, 2025, setting forth BOEM's ongoing violations of OCSLA. That Notice of Intent to Sue was delivered to all relevant recipients in the week of December 24-31, 2025. As such, more than 60-days have elapsed since the receipt of that notice.

33.    Alternatively, Plaintiffs pursue their OCSLA claims through the APA, as BOEM's approval of Sunrise Wind  was arbitrary and capricious, and contrary to law, and unsupported by

substantial evidence, due to the reasons set forth below (including but not limited to APA subsections, 5 U.S.C. §706(2)(A), (C)).

34.    BOEM is engaging in ongoing violations of OCSLA because it continues to allow Sunrise Wind to be constructed under approvals that were issued using an interpretation of OCSLA § 8(p)(4) (43 U.S. Code § 1337(p)(4)) that BOEM has since withdrawn as erroneous.

35.    On May 1, 2025, DOI withdrew M-37067,[5] reinstated M-37059, and directed all DOI offices to reevaluate any prior action taken in reliance on M-37067. Sunrise Wind's COP and ROD were expressly issued under M-37067.[6] BOEM has refused to reevaluate or suspend those approvals.

36.    Because § 8(p)(4) imposes mandatory duties on BOEM to ensure each statutory criterion is satisfied, BOEM's ongoing failure to reevaluate or suspend its approvals constitutes a present and continuing violation of OCSLA.

37.    BOEM acknowledged, in its May 1, 2025 memorandum from the Acting Solicitor, that the correct reading of OCSLA is one that interprets the OCSLA § 8 (p)(4) criteria as mandatory, to wit, BOEM must ensure that each criterion is met in a manner that is not to the detriment of the other criteria.[7]

---

[5] U.S. Department of Interior, Office of the Solicitor, May 1, 2025, M-37086 – Memorandum, Withdrawal of Solicitor's Opinion M-37067 and Reinstatement of M-Opinion 37059 https://www.doi.gov/sites/default/files/documents/2025-05/m-37086.pdf

[6] See, Sunrise Wind ROD, page 9: "According to M-Opinion 37067, "[t]he subsection does not require the Secretary to ensure that the goals are achieved to a particular degree, and she retains wide discretion to determine the appropriate balance between two or more goals that conflict or are otherwise in tension" (Sol. Op. M-37067)." https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/05579_Record%20of%20Decision_Sunrise%20Wind_OCS-A%200487.pdf

[7] Id.

38.     Given the prior interpretation (rationally balance the (p)(4) goals) was rescinded, BOEM is now required to apply the correct interpretation. As BOEM concedes, any "Departmental action taken in reliance on the now withdrawn M-Opinion 37067, should be reevaluated in light of this Memorandum." Id.

39.     Accordingly, continuing the Sunrise Wind ROD and COP, (thereby countenancing them to construct and operate) without reevaluation of the project constitutes an ongoing violation of OCSLA § 8(p)(4). When applying those mandatory criteria, it is apparent that BOEM failed to consider or inadequately considered substantial negative impacts, see *infra*.

40.     Not only is the March 2024 ROD/COP contrary to OCSLA and the APA, 5 U.S.C. §706(2), BOEM's post-May 2025 failure to reevaluate Sunrise Wind's approvals constitute "agency action unlawfully withheld or unreasonably delayed," in contravention of 5 U.S.C. §706(1). The May 1, 2025 Solicitor Memorandum constitutes a binding agency directive requiring reevaluation of prior actions taken in reliance on M-37067. BOEM's failure to undertake such reevaluation with respect to Sunrise Wind constitutes agency action unlawfully withheld under 5 U.S.C. § 706(1).

41.     Sunrise Wind is an offshore wind energy project located on the Outer-Continental Shelf to the south of Massachusetts, sanctioned by BOEM pursuant to a COP and ROD issued March 25, 2024, published in the Federal Register on March 29, 2024.

42.     Pursuant to 43 U.S.C. § 1337(p)(4) (§ 8(p)(4)), BOEM failed to ensure that each and every mandatory criterion is satisfied, particularly, § 8(p)(4)(A-F).

**B. Failure to Ensure National Security — § 8(p)(4)(F)**

43.     Pursuant to 43 U.S.C. § 1337(p)(4)(F), "protection of national security interests of the United States," BOEM has abdicated its duty to ensure that national security interests have

been stewarded.

44.    Sunrise Wind interferes with numerous different radar systems. BOEM enlisted Westslope Consulting to conduct radar and navigational aid screening studies for other adjacent offshore wind projects, such as Beacon Wind and Revolution Wind, the latter of which is an adjacent lease area, located immediately to the northwest of Sunrise Wind. Revolution Wind's lease area effectively abuts the Sunrise Wind lease area, hence, the results from BOEM's Westslope commissioned analysis are highly probative and can be applied here.

45.    BOEM did not conduct a project-specific radar line-of-sight or interference analysis for Sunrise Wind. Despite the project's immediate adjacency to the Revolution Wind lease area, and despite BOEM's own regional radar-interference analyses demonstrating the susceptibility of coastal and defense radar systems to offshore wind development in this region, BOEM approved Sunrise Wind without ensuring that its turbines would not impair radar systems critical to national defense, aviation safety, and maritime navigation.

46.    BOEM did not conduct a Sunrise Wind–specific radar analysis comparable to those performed for immediately adjacent projects, nor did it adequately address Sunrise Wind in regional screening analyses,[8] and also failed to conduct the project-specific line-of-sight and system-specific evaluations that it performed for the immediately adjacent Revolution Wind project. For example, BOEM neither conducted nor commissioned a turbine-by-turbine Line of Sight (LOS) analysis or blade tip height analysis for the impact of the Cape Cod Air Force Station Early Warning Radar ballistic missile defense system with respect to Sunrise Wind, inter alia. That

---

[8] Radar Interference Analysis for Renewable Energy Facilities on the Atlantic Outer Continental Shelf, OCS Study BOEM 2020-039, August 2020, https://www.boem.gov/sites/default/files/documents/environment/Radar-Interferance-Atlantic-Offshore-Wind_0.pdf

omission is paradigmatic of BOEM's arbitrary and capricious national security omissions with respect to Sunrise Wind, and hence its failure to comply with OCSLA, 43 U.S.C. § 1337(p)(4)(F).

47.    BOEM's failure to conduct a Sunrise Wind–specific analysis, in light of readily available analyses for adjacent projects and BOEM's own Atlantic OCS radar studies, constitutes a failure to consider an important aspect of the problem and violates OCSLA § 8(p)(4) and the APA.

48.    Sunrise Wind is situated within the direct radar line of sight of the Cape Cod Space Force Station's PAVE PAWS Early Warning Radar ("EWR") system, the sole East Coast installation providing continuous ballistic missile early warning and airspace surveillance for the United States. See the following image, which was generated utilizing the data[9] from two maps provided by Westslope Consulting to the U.S. Department of Interior (BOEM).

---

[9] https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/App_S2%20RevWind%20Radar%20and%20Navigational%20Aid%20Screening%20Study.pdf (p. 12), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Appendix%20Y4_Radar%20and%20Navigational%20Aid%20Screening%20Study.pdf (p. 12)



49.     As depicted in the above image, Sunrise Wind's turbines at a 1067 ft blade tip height fall within the radar line-of-sight envelope and therefore present a significant risk of interference with the Cape Cod Space Force Station's PAVE PAWS Early Warning Radar ("EWR") system. The dark yellow area denotes regions that fall within the line of sight ("LOS") of the Cape Cod EWR (denoted by the red dot), given a blade tip height of 808-873 feet. The dark grey depicts the area of significant impact considering a taller turbine (1,067 ft. blade tip height). As such, the Sunrise Wind turbines could significantly disrupt Early Warning Radar and airspace surveillance.

50.     The Revolution Wind Westslope Consulting analysis identified innumerable radar systems implicated by the Revolution Wind proposed project. As noted, those results are largely applicable to Sunrise Wind given the close spatial proximity in lease areas. Extrapolating the Revolution Wind Westslope analysis to Sunrise Wind, a substantial proportion of Sunrise Wind's turbines impact the Line of Sight of the following radars: Nantucket ASR-9, Providence ASR-9, Cape Cod AFS EWR (ballistic missile early warning radar), Block Island Long Range High-

Frequency (HF) Radar, Camp Varnum HF Radar, Horseneck Beach State Reservation HF Radar, Long Point Wildlife Refuge HF Radar, Martha's Vineyard HF Radar.[10]

51.    That analysis for Revolution Wind concluded as follows in terms of real-world impacts from the turbine induced line of sight impairments, "For the Falmouth ASR-8, Nantucket ASR-9, and the Providence ASR-9, without mitigation, the radar effects due to clutter will include a partial loss of primary target detection and a number of false primary targets over and in the immediate vicinity of wind turbines within line-of-sight in the study area. Other radar effects include a partial loss of weather detection and false weather indications over and in the immediate vicinity of wind turbines within line-of-sight in the study area." For the HF radars, they concluded, "For the Amagansett HF radar, Block Island Long Range HF radar, Block Island Standard Range HF radar, Camp Varnum HF radar, Horseneck Beach State Reservation HF radar, Long Point Wildlife Refuge HF radar, Martha's Vineyard HF radar, MVCO Meteorological Mast HF radar, Nantucket HF radar, and the Squibnocket Farms HF radar, without mitigation, the radar effects will include clutter in the vicinity of wind turbines within line-of-sight in the study area and possibly in the vicinity of wind turbines beyond line-of-sight in the study area due to the propagation of HF electromagnetic waves over the ocean surface. Because wind turbines will be within line-of-sight of these radar sites, Westslope expects that multiple federal agencies in partnership with NOAA's IOOS may have concerns with wind turbines within line-of-sight in the study area at a blade-tip height of 873 feet AGL based on potential interference to these HF radar

---

[10] Revolution Wind Project Radar And Navigational Aid Screening Study September 3, 2021, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/App_S2%20RevWind%20Radar%20and%20Navigational%20Aid%20Screening%20Study.pdf

See figures, passim.

sites."[11]

52.    BOEM's failure to conduct or commission a project-specific radar line-of-sight analysis for Sunrise Wind — and its failure to include Sunrise Wind in its own high-level regional screening analysis — left the national security implications of this project entirely unexamined. Under the mandatory M-37059 standard, BOEM was required to affirmatively ensure that § 8(p)(4)(F) was satisfied. It did not do so. That failure constitutes a violation of OCSLA and renders the approval arbitrary and capricious under 5 U.S.C. § 706(2)(A).[12]

53.    Moreover, BOEM arbitrarily and capriciously failed to consider the impacts of Sunrise Wind on disruption of maritime navigation and safety operations, threats to underwater surveillance and communications, cybersecurity and grid vulnerabilities, and the attendant cumulative impacts to national security.

54.    There is no evidence that BOEM adequately considered the substantial safety concerns induced via Sunrise Wind's interference with aircraft (commercial, military, etc.), significant national security concerns, nor did they ensure the "protection of national security interests of the United States." 43 U.S.C. § 1337(p)(4)(F). Due to the withdrawn M-37067 Opinion and reinstatement of M-37059 Opinion, BOEM is obligated to ensure each of the mandatory criteria are satisfied. The approval of Sunrise Wind occurred in reliance on a flawed interpretation of 43 U.S.C. § 1337(p)(4) wherein safety, protection of the environment, prevention of interference

---

[11] Revolution Wind Project Radar And Navigational Aid Screening Study September 3, 2021, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/App_S2%20RevWind%20Radar%20and%20Navigational%20Aid%20Screening%20Study.pdf

[12] Radar Interference Analysis for Renewable Energy Facilities on the Atlantic Outer Continental Shelf, OCS Study BOEM 2020-039, August 2020, https://www.boem.gov/sites/default/files/documents/environment/Radar-Interferance-Atlantic-Offshore-Wind_0.pdf

with reasonable uses, and national security interests were merely rationally balanced with the other criteria. BOEM violates OCSLA in an ongoing way by failing to take action to suspend or reconsider Sunrise Wind's approvals in view of the charge of the May 1, 2025 Solicitor Memorandum and concomitant reinstatement of the M-37059 Opinion.

**C. Failure to Ensure Safety and Prevent Discharge — § 8(p)(4)(D)**

55.    Moreover, BOEM failed to sufficiently prepare for and mitigate, blade failure events in contravention of OCSLA, 43 U.S.C. § 1337(p)(4)(D). The OCSLA implementing regulations at 30 CFR 585.105 provide in pertinent part: "(a) Design your projects and conduct all activities in a manner that ensures safety and will not cause undue harm or damage to natural resources, including their physical, atmospheric, and biological components to the extent practicable; and take measures to prevent unauthorized discharge of pollutants including marine trash and debris into the offshore environment."

56.    There is no evidence in the ROD, COP, or other BOEM compliance filings that the Secretary has directed the project developer or otherwise taken such steps necessary to obviate the above from eventuating. As observed in the case of Vineyard Wind 1 and the concomitant blade failure incident of summer 2024 – such an event was unacknowledged by BOEM and the project developer notwithstanding extensive evidence extant regarding blade failure events. Thus, BOEM failed to comply with the aforesaid regulations due to an absence of required measures to prevent discharge of pollutants including marine trash and debris (including blades) into the offshore environment. This is thus about failure to require preventive design and mitigation. The Sunrise Wind project was unequivocally not designed in a manner to prevent unauthorized discharge of pollutants into the offshore environment.

57.    The turbines themselves constitute independent navigation hazards for the

commercial and recreational fishermen who have worked these waters for decades. Marine radar is the primary navigation tool for safe operation in fog, storm, and reduced visibility conditions common to these waters. The turbines interfere with small craft radar, rendering it unreliable by the scatter and clutter. A fisherman navigating in heavy weather through or near the Sunrise Wind lease area cannot distinguish vessel returns from turbine returns on his radar screen. The 94 turbines approved for the Sunrise Wind lease area, operating alongside the adjacent Revolution Wind and South Fork Wind installations, create a wall of radar clutter across waters that Plaintiffs Brown, Debbis, Hittinger, Malone, and other commercial and recreational fishermen have navigated safely for decades. BOEM approved this project without analyzing the specific impact of turbine-induced radar scatter on the navigational safety of fishermen operating in these waters, without requiring mitigation measures that would preserve the reliability of marine radar in the lease area, and without ensuring that the Project would not interfere with the reasonable and longstanding use of these waters for commercial and recreational fishing. That failure violates OCSLA § 8(p)(4)(D) and (I) and renders the approval arbitrary and capricious under 5 U.S.C. § 706(2)(A).

58.     BOEM also failed to comply with 30 CFR 585.105 by approving the Project's Offshore Converter Station Cooling Water Intake Structure, which continuously discharges up to 7.8 million gallons per day of thermal effluent at temperatures approaching 90°F, treated with a sodium hypochlorite biocidal agent, directly into the marine environment of the Outer Continental Shelf. This constitutes an ongoing, authorized discharge of pollutants into the offshore environment that BOEM approved without requiring preventive design measures or alternatives. The full treatment of BOEM's CWIS failures, including the application of inappropriate standards, entrainment mortality, prey depletion, and cumulative ecological impacts, is set forth in Section D

below.

**D. Failure to Ensure Environmental Protection and Natural Resource Conservation — § 8(p)(4)(A) and (B)**

59.     The Offshore Converter Station (OCS-DC) for the Sunrise Wind Project incorporates an open-loop Cooling Water Intake Structure (CWIS) that continuously withdraws up to 7.8 million gallons per day of seawater from the Outer Continental Shelf, processes it through the station's cooling system at temperatures approaching 90°F (32°C), and discharges it back into the marine environment laced with a biocidal agent similar to bleach. This CWIS operates throughout the calendar year, entraining and killing marine organisms at critical life stages.

60.     BOEM's duty under OCSLA § 8(p)(4)(A) and (B) cannot be discharged by deferring to another agency's permitting decision — and it certainly cannot be discharged by deferring to another agency's application of the wrong legal standard.

61.     The EPA issued a permit for this new structure (NPDES Permit No. MA0004940), by applying an incorrect assessment standard.

62.     The EPA was required to apply the Best Technology Available (BTA) standard, based on size of the intake (over 2 million gallons a day). CWA § 316(b) mandated BTA for this facility as a matter of law.

63.     Instead, the EPA applied Best Professional Judgement instead (BPJ).  BPJ does not apply where § 316(b) BTA is mandatory. EPA therefore applied the wrong legal standard.

64.     BTA for new offshore facilities required BOEM and EPA to evaluate whether closed-cycle cooling or other alternatives to open-loop intake could substantially reduce entrainment mortality. BPJ does not require such an evaluation. Because of the EPA's erroneous

application of the wrong standard, that evaluation never occurred.

65.    BOEM accepted EPA's BPJ permit without independently evaluating whether BTA was required, without assessing what BTA would have demanded, and without determining whether the open-loop cooling design satisfies its own § 8(p)(4)(A) and (B) obligation to ensure environmental protection. By accepting a permit issued under the wrong legal standard, BOEM cannot claim to have ensured that the Project's cooling system reflects the best available technology for minimizing the destruction of marine organisms. It ensured only that EPA made a professional judgment — a lower and legally inapplicable standard.

66.    The developer's own Ichthyoplankton Entrainment Assessment, prepared by TRC Environmental Corporation in February 2023 and submitted as Appendix N2 to the Construction and Operations Plan,[13] projects — assuming 100% mortality of entrained organisms — that the OCS-DC CWIS will kill approximately 2,941,824 fish larvae annually, including larvae of Atlantic cod (Gadus morhua), and other commercially and ecologically significant species with designated Essential Fish Habitat in the Sunrise Wind Farm lease area. Using the developer's own egg-to-larvae multiplier, the assessment further projects the destruction of approximately 29,418,238 fish eggs annually, including 342,389 Atlantic cod eggs. These losses occur continuously over the operational lifetime of the Project, which is measured in decades.

67.    Of particular significance, the assessment projects the annual entrainment and killing of over 8 billion zooplankton (8,013,047,593), including approximately 1,100,564,690 Calanus finmarchicus —the copepod that constitutes the primary prey of the North Atlantic Right Whale (Eubalaena glacialis) (NARW). The destruction of over one billion Calanus finmarchicus

---

[13] Appendix N2, Ichthyoplankton Entrainment Assessment, 2023, https://www.boem.gov/renewable-energy/state-activities/srw01copappn2ichythyoplanktonentrainmentassessment

annually at a single offshore structure in the heart of the Right Whale's feeding range directly compounds the operational impacts on the NARW that BOEM failed to adequately analyze, as set forth supra, and further demonstrates BOEM's failure to ensure protection of the environment and conservation of natural resources as required by OCSLA § 8(p)(4)(A)–(D).

68. BOEM failed to assess the cumulative entrainment impacts of the OCS-DC in combination with the four cooling system substations approved for the South Coast Project, that may have up to 5 such substations, operating in the same marine ecosystem, further compounding its failure.

69. The CWIS represents a violation that will accrue anew each day the structure operates. The harm is not contingent on any future event, any triggering incident, or any additional agency decision. It is the designed and approved operational function of a structure BOEM authorized without requiring alternatives to open-loop cooling technology, and without evaluating cumulative entrainment impacts across co-located projects operating in the same marine ecosystem. This uncritical adoption constitutes a failure to comply with OCSLA § 8(p)(4)(A)–(D) and an abdication of BOEM's non-delegable duty to ensure that the mandatory environmental protection criteria are satisfied.

70. A structure that destroys 2.9 million fish larvae, 29.4 million fish eggs, and over 8 billion zooplankton annually — including 1.1 billion individuals of the primary prey species of a critically endangered marine mammal — cannot be said to operate in a manner that ensures environmental protection or natural resource conservation under any reading of those mandatory criteria, let alone the demanding mandatory standard of M-37059 that BOEM is now concededly required to apply. The ongoing operation of the CWIS therefore constitutes not merely a

consequence of a flawed past approval but an independent and continuing violation of OCSLA § 8(p)(4)(A) and (B) that this Court has authority to enjoin regardless of how it resolves the challenges to the original approval decision.

71.     The Cooling Water Intake Structure has already been installed and constitutes an independent, ongoing, and continuous violation of OCSLA § 8(p)(4)(A) and (B).

72.     BOEM further failed to ensure protection of the environment and conservation of natural resources as required by 43 U.S.C. § 1337(p)(4)(A) and (B) by approving the Project's CWIS without analyzing how the continuous destruction of over one billion Calanus finmarchicus annually would interact with existing stressors on the North Atlantic Right Whale population — including documented prey scarcity, poor female body condition, suppressed calving rates, and vessel strike mortality — to affect the survival prospects of the species. The relevant question under the mandatory M-37059 standard is not simply how many organisms the CWIS destroys in isolation; it is what the removal of that prey base does to a population NOAA has already characterized as nutritionally stressed and functionally declining. BOEM never asked that question.

73.     In addition to the foregoing Cooling Water Intake Structure (CWIS) entrainment impacts, BOEM independently failed to ensure protection of the environment and conservation of natural resources of the Outer Continental Shelf as required by OCSLA § 8(p)(4)(A) and (B) by refusing to analyze the biofouling-driven depletion of primary productivity from the introduction of numerous new structures (the monopiles) in coastal waters.[14]  This real threat is grounded in peer-reviewed scientific literature that Plaintiffs placed in the administrative record during the

---

[14] Malerba, M.E., White, C.R., and Marshall, D.J. (2019). The outsized trophic footprint of marine urbanization. Frontiers in Ecology and the Environment, doi:10.1002/fee.2074.

DEIS comment period and that BOEM failed to address. BOEM's failure to address this constitutes an additional and independent failure to ensure that the Project is conducted in a manner that protects the environment and conserves the natural resources of the Outer Continental Shelf, as required by OCSLA § 8(p)(4)(A) and (B). The failure of BOEM to analyze the cumulative trophic footprint of the Project's artificial structures — after being specifically directed to this scientific concern in public comments — renders its approval not merely incomplete but demonstrably arbitrary and capricious under 5 U.S.C. § 706(2)(A).

74.     BOEM failed to ensure protection of the environment under OCSLA § 8(p)(4)(A) and (B) by refusing to adequately analyze the Project's foreseeable role in promoting harmful algal blooms. The same biofouling-driven disruption of primary productivity and water column nutrient dynamics that BOEM refused to analyze poses an independent and foreseeable risk of harmful algal blooms in the waters surrounding the Project. Plaintiffs submitted comments identifying the mechanism by which biofouling-driven deoxygenation and nutrient disruption can trigger harmful algal blooms, citing peer-reviewed literature and two documented regional examples — a catastrophic marine die-off coinciding with construction of the Hornsea 1 and 2 wind farms in the North Sea, and a domoic acid bloom contaminating Narragansett Bay shellfish in the year following construction of the Block Island Wind Farm (BOEM-2022-0071-0232). BOEM's response mischaracterized Plaintiffs' argument, addressed a different mechanism than the one identified, and did not engage with the Block Island example at all. An agency that answers a question the commenter did not ask while ignoring directly relevant domestic evidence has not engaged in reasoned decision-making. State Farm, 463 U.S. at 43. Harmful algal blooms contaminate commercially harvested shellfish with neurotoxins, trigger fishery closures, and destroy shellfishing grounds on which Plaintiffs and the Narragansett and Wampanoag Tribes have

depended for generations. Under the mandatory M-37059 standard, BOEM was required to affirmatively ensure that the Project would not cause this harm — not ignore it. BOEM's failure to analyze or prevent this foreseeable harm constitutes an independent violation of OCSLA § 8(p)(4)(A), (B), and (I) and renders the approval arbitrary and capricious under 5 U.S.C. § 706(2)(A).

75. OCSLA does not permit BOEM to authorize offshore energy development while ignoring substantial threats to marine food-web integrity and ecosystem function. The destruction of billions of zooplankton and millions of fish larvae and eggs annually by the CWIS, in addition to the primary productivity losses sustained by introducing new surface area for the colonization of filter feeders, is not a minor or incidental consequence; it is a direct operational impact of the approved Project that BOEM was required to evaluate and prevent to the extent necessary to ensure environmental protection and natural-resource conservation under § 1337(p)(4)(A) and (B). BOEM's failure to do so constitutes an independent violation of OCSLA and renders the approval arbitrary, capricious, and contrary to law under 5 U.S.C. § 706(2)(A).

76. BOEM also failed to consider the entire lifecycle of the project, deferring specific decommissioning plans and financial assurances. BOEM allowed the financial security of the developer to suffice, drawing on past experience with oil and gas. Unlike oil and gas, however, Sunrise Wind, LLC is a special purpose vehicle that insulates the parent company (Orsted) from financial liability in the future, with no assets other than the turbines themselves. By approving the project without adequate financial assurances, BOEM failed to ensure that the Project will be conducted in a manner that protects the environment through the end of its operational life as required by OCSLA § 8(p)(4)(A) and 30 C.F.R. § 585.516.

**E. Failure to Prevent Interference with Reasonable Uses — § 8(p)(4)(I)**

77.    As alleged in the standing section, Plaintiffs Brown, Debbis, Hittinger, and Malone, as well as other members of Green Oceans and NEFSA, have fished the waters of the Sunrise Wind lease area for decades. Commercial fishing, recreational fishing, and marine wildlife observation are reasonable uses of the exclusive economic zone that predate and coexist with BOEM's authority to authorize offshore energy development. BOEM approved the Project knowing that its construction and operation would displace commercial trawling, destroy fish early life stages in Essential Fish Habitat, create navigational hazards incompatible with safe fishing operations, continuously entrain the prey base of species on which those fisheries depend, and degrade the marine resources and ancestral waters on which both the Wampanoag and Narragansett Tribes rely for subsistence, cultural practice, and intergenerational teaching. These are not speculative future conflicts. They are ongoing, documented interferences with established uses that BOEM was required under § 8(p)(4)(I) to prevent — not merely acknowledge, compensate for, or defer.

78.    Fishing is not the only reasonable use of these waters that BOEM's approval foreseeably interferes with. Both Tribes use these waters and the surrounding seascape for ceremonial practice, intergenerational teaching, and the continuation of cultural and spiritual relationships with their ancestral homeland that predate BOEM's authority by centuries. Plaintiff Knight regularly navigates the waters affected by The Project in her boat. The Project has already forced her to alter her boating routes, reduce the frequency of her trips, and has diminished the aesthetic and scientific enjoyment of these waters through the introduction of intrusive industrial infrastructure into a marine environment she regularly observes. Plaintiffs Vitton and Craig hold historic oceanfront properties whose architectural integrity, cultural value, and continued use as

38

historic residences are inextricably tied to unobstructed ocean viewsheds that the Project's turbines, lighting, and associated infrastructure materially and permanently degrade. BOEM approved the Project without ensuring that any of these established, lawful, and longstanding uses would be protected from interference as required by § 8(p)(4)(I). That failure is independent of and in addition to the fishing interference documented above, and constitutes an additional and independent violation of OCSLA's mandatory criteria.

79.     BOEM further failed to ensure that the Project would be carried out in a manner that provides for the prevention of interference with other reasonable uses of the exclusive economic zone, as required by 43 U.S.C. § 1337(p)(4)(I), because degradation of the marine food web and depletion of ecologically and commercially important species' early life stages foreseeably impairs the continued reasonable use of these waters for fishing, marine wildlife observation, and other longstanding ocean-dependent uses. By approving the CWIS without adequate analysis, avoidance, or mitigation of these impacts, BOEM failed to ensure compliance with OCSLA's mandatory criteria.

**F. BOEM's Mitigation Was Legally Inadequate Under Any Standard**

80.     BOEM further violated OCSLA § 8(p)(4) by substituting inadequate, deferred, and unenforceable mitigation measures for the affirmative environmental protection and interference prevention the statute mandates. As set forth below, the specific measures BOEM accepted — monetary payments to NORAD, developer-administered fishing compensation, and temporal deferrals — do not prevent the harms they purport to address; they merely acknowledge that those harms will occur.

81.     NORAD radar mitigation relies on out-sourced monetary payments of $80,000 from the developer to NORAD with no proof that such funds will allow for an upgrade that will compensate for the impacts. BOEM has no authority to collect this payment or alter the mitigation, if the developer fails to provide the money, or if the mitigation falls short of expectations (82-83 (Section 4.2.1.2).[15]

82.     BOEM outsources to the developer monetary compensation to mitigate harms to recreational and commercial fishing, and shoreside businesses. Monetary compensation is not considered a legal form of mitigation under OCSLA. It does not prevent interference. In fact, such a compensation scheme that extends over the lifetime of the project admits ongoing interference (Sections 6.1.1-6.1.1.3.2, Tables 6.1.3-1 and 6.1.3-2).

83.     BOEM's monetary mitigation for navigation safety impacts is illegal under OCSLA. Monetary mitigation admits the ongoing problem of diminished safety and does not prevent this negative impact (Sections 6.1.1.3.1-6.1.1.3.2). Moreover, this was only available to commercial fishermen, not other boaters or recreational fishermen.

84.     BOEM abdicated its responsibility to prevent interference with NMFS scientific surveys to both the developer and NMFS. They have allowed the project to proceed, despite major adverse impacts to these surveys, without an agreement in place. This deferred and out-sourced mitigation is illegal under OCSLA.

85.     BOEM defers its responsibility for mitigating the impacts on avian breeding, recreation/tourism, and eelgrass growing to later dates. Such temporal deferrals are illegal under OCSLA.

---

[15] Sunrise Wind, Record of Decision:
https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/05579_Record%20of%20Decision_Sunrise%20Wind_OCS-A%200487.pdf

## G. Closing: BOEM's Continuing Violation and the Solicitor Memorandum

86.    The failures documented in Sections B through F are not isolated errors of judgment. They share a single cause. BOEM approved Sunrise Wind under M-37067, which permitted it to rationally balance the § 8(p)(4) criteria against one another rather than affirmatively ensure that each mandatory criterion was satisfied. Under that permissive standard, BOEM could approve a project that interferes with ballistic missile early warning radar, authorizes continuous discharge of biocidal agents and thermal effluent into critical marine habitat, destroys billions of marine organisms annually, displaces fishermen and tribal harvesters from waters they have worked for generations, insulates the developer from decommissioning liability, and substitutes monetary payments for the prevention of harm — because each of those failures could be weighed against the project's energy benefits and found acceptable. That standard has been withdrawn. It is no longer the law.

87.    BOEM's approval further demonstrates the application of the wrong standard because it failed to ensure protection of public health and the environment with respect to harms it was specifically put on notice of but declined to prevent: the continuous release of PFAS and BPA from blade erosion into the marine food chain, addressed further in the Third Cause of Action at ¶¶ 191-192; the Project's foreseeable role in promoting harmful algal blooms that contaminate commercially harvested shellfish with neurotoxins, addressed at ¶¶ 195-196; the ongoing resuspension of legacy toxic contaminants from seafloor sediments that will bioaccumulate in locally harvested seafood, addressed at ¶¶ 197-198; and the Project's contribution to authorized takes amounting to 274% of the North Atlantic Right Whale population when considered cumulatively with co-located projects, addressed at ¶ 164. Under the mandatory M-37059

standard, BOEM was required to affirmatively ensure that none of these harms would result. It made no such determination because it applied the wrong legal standard.

88.    Finally, BOEM abdicated its duty via its failure to analyze the cumulative and reasonably foreseeable environmental effects of turbine coatings, in contravention of OCSLA's mandate that the Secretary ensure activities are conducted in a manner that prevents environmental harm. BOEM's failure to analyze these impacts deprived decisionmakers and the public of the information necessary to evaluate the environmental consequences of the project.

89.    The consequences of that error are not limited to the original approval decision. The May 1, 2025 Solicitor Memorandum acknowledged the error, withdrew M-37067, reinstated M-37059, and directed all DOI offices to reevaluate prior actions taken in reliance on the withdrawn opinion. Sunrise Wind's ROD and COP were expressly issued under M-37067. BOEM has refused to reevaluate or suspend those approvals. That refusal constitutes agency action unlawfully withheld under 5 U.S.C. § 706(1), independent of and in addition to the substantive violations established above. This Court has authority to remedy both.

## SECOND CAUSE OF ACTION

**[Violations Of The National Historic Preservation Act and the Administrative Procedure Act]**

90.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

91.    Plaintiffs Wampanoag Tribe of Gay Head–Aquinnah, Narragansett Indian Tribe, Elizabeth Vitton, and Sandra Craig have historic, cultural, and procedural interests within BOEM's identified Areas of Potential Effects and will be harmed under the NHPA (see also, *supra*).

42

92.     First, it is indisputable that Gay Head-Aquinnah is designated as a historic district, and the district was added to the National Register of Historic Places in 1999.

93.     The lands of the WAMPANOAG TRIBE OF GAY HEAD (Aquinnah) held by the United States in trust for the benefit of the Wampanoag Aquinnah Tribe are on the island of Martha's Vineyard.

94.     As such, these Plaintiffs' properties are deemed "historic" due to their location in a historically designated area. This confers standing to Plaintiffs regarding their National Historic Preservation Act claims.

95.     Section 106 of the National Historic Preservation Act ("NHPA"), 54 USCS § 306108, demands that "the head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property."

96.     BOEM determined that Sunrise Wind is an "undertaking" within the meaning of 54 USC § 306108, and thus subject to Section 106 review.[16]

97.     The regulations implementing Section 106 at 36 CFR 800.2 et seq., provide that Section 106 consultation involves a) initiation of consultation (undertaking determined), b) identification of historic properties in the Area of Potential Effects, c) assessment of whether the action would engender adverse effects to historic properties, and d) resolution of adverse effects.

---

[16] Sunrise Wind - Appendix A: Required Environmental Permits and Consultations, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Appendix%20A_Required%20Environmental%20Permits%20and%20Consultations_0.pdf

98.    Part and parcel of this consultation is sufficient involvement of the public, see 36 CFR 800.2(d)(1)-(3), "The agency official shall seek and consider the views of the public in a manner that reflects the nature and complexity of the undertaking and its effects on historic properties, the likely interest of the public in the effects on historic properties, confidentiality concerns of private individuals and businesses, and the relationship of the Federal involvement to the undertaking." 36 CFR 800.2 (d)(1).

99.    "The agency official must, except where appropriate to protect confidentiality concerns of affected parties, provide the public with information about an undertaking and its effects on historic properties and seek public comment and input. Members of the public may also provide views on their own initiative for the agency official to consider in decisionmaking." 36 CFR 800.2 (d)(2).

100.    Secondarily, Gay Head - Aquinnah is a historically designated area within the Area of Potential Effects, therefore, BOEM was required to assess whether the undertaking would engender adverse effects to this historic island. As BOEM concluded, "The areas that only include visibility of the WTG blades include the majority of inland areas on mainland Rhode Island and Massachusetts, and the majority of Nantucket Island. Blade-only visibility is also indicated within the coastal pond on the **south side of Martha's Vineyard**, the Martha's Vineyard Airport, Great Salt Pond on Block Island, and along the coastal beaches southwest of Montauk on Long Island (see Inset 3.1-1)."[17]

101.    BOEM concluded that the undertaking would have a "significant impact" on the landscape, seascape, ocean for Aquinnah Overlook, Aquinnah Overlook Sunset, Aquinnah

---

[17] Construction and Operations Plan, Appendix Q1, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/SRW01_COP_AppQ1_VIA_2022-08-19_508.pdf

44

Overlook – Nighttime, and Gay Head Lighthouse – sunset.

102.    "Six of the 11 KOPs that could experience significant adverse visual impacts are located on Martha's Vineyard including Peaked Hill (MV12) during sunset, Lucy Vincent Beach (MV03) during sunset, Moshup Beach (MV05), Aquinnah Overlook (MV07) during nighttime and sunset, Gayhead Lighthouse (MV09) during sunset, and Edwin D. Vanderhoop House (Aquinnah Cultural Center [MV13]). All six of these KOPs are located between 21.0 miles (33.8 km) and 22.9 miles (36.9 km) from the SRWF. Each of these KOPs have a simulation or rendering presenting high contrast lighting conditions that would only occur when the turbines are strongly front lit or backlit." Id. at 191.

103.    The BOEM appendix in fact explicitly concedes the injurious impact on the Wampanoag Tribe itself, "The blade tip viewshed results suggest potential SRWF visibility from Martha's Vineyard along the western and southern shores and bluffs, and to a lesser extent along the northwest portions of the island's shoreline. **The most notable northwestern areas of visibility include the Wampanoag-Aquinnah Trust Land**, West Basin Road, Peases Point, and Cedar Tree Neck Sanctuary. More concentrated areas of visibility are shown along the western shore around Aquinnah Cliffs, Gay Head Lighthouse, Zacks Cliffs, Long Beach, south to Squibnocket Point, and across the open water on Squibnocket Pond."

104.    BOEM acknowledges the adverse effect of the Sunrise Wind Project to the Aquinnah area resources, and BOEM appears to rely on ineffective putative mitigations such as "white color" of the turbines, uniformity of design, and "Aircraft Detection Lighting System (ADLS) or related means (e.g., dimming or shielding)." But this does not eliminate or alleviate the fact that a significant visual adverse harm will be incurred by the Aquinnah area resources, thus harming the WAMPANOAG TRIBE OF GAY HEAD, AQUINNAH. This entirely fails to mitigate

45

the visual intrusion during daylight hours, which is the principal time frame during which the adverse visual effect occurs.

105. Pursuant to 36 CFR 800.6, BOEM is required to consult with various parties and "to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties."

106. However, BOEM was derelict in its duty to require legally adequate mitigation of the adverse visual effects of Sunrise Wind on the historic, archeological, and cultural areas.

107. Note that, "An essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective . . . The Supreme Court has required a mitigation discussion precisely for the purpose of evaluating whether anticipated environmental impacts can be avoided . . . A mitigation discussion without at least *some* evaluation of effectiveness is useless in making that determination." South Fork Band Council of Western Shoshone of Nevada v. U.S. Department of the Interior, 588 F.3d 718 (9th Cir. 2009).

108. As such, the agency cannot simply delineate various mitigations with no substantive analysis of whether these mitigations will actually impart the intended effect of mitigating the visual impact.

109. The mitigations required for visual adverse effect do not, in fact, materially alter the visual appearance of the turbines.

110. There is no cogent evidence that such mitigations diminish the intensity of the adverse visual effect on Martha's Vineyard.

111. Therefore, Plaintiffs will suffer harm due to the adverse visual effect of Sunrise Wind.

112. As such, BOEM arbitrarily and capricious concluded that it "resolved" the adverse effects of Sunrise Wind, in violation of 36 CFR § 800.6 and NHPA Section 106. Authorizing Sunrise Wind without Section 106 compliance was arbitrary, capricious, and contrary to law.

113. Furthermore, Section 110(f) of the NHPA demands a heightened degree of scrutiny with respect to minimizing harm to National Historic Landmarks. 54 USC § 306107. The Ocean Drive Historic District in Newport, Rhode Island, within which Plaintiff Elizabeth Vitton's property 'Indian Spring' is a contributing resource, is a designated National Historic Landmark District, having received that designation in 1976. Accordingly, BOEM was required to apply the heightened § 110(f) standard of care with respect to the adverse effects of Sunrise Wind on the Ocean Drive NHL District and Plaintiff Vitton's property within it.

114. "Section 110(f) of the act requires that the agency official, to the maximum extent possible, undertake such planning and actions as may be necessary to minimize harm to any National Historic Landmark that may be directly and adversely affected by an undertaking. When commenting on such undertakings, the Council shall use the process set forth in §§ 800.6 through 800.7 and give special consideration to protecting National Historic Landmarks as specified in this section." 36 CFR 800.10(a).

115. "Resolution of adverse effects. The agency official shall request the Council to participate in any consultation to resolve adverse effects on National Historic Landmarks conducted under § 800.6." 36 CFR 800.10(b).

116. BOEM failed to comply with the heightened standards of scrutiny stipulated under these statutory and regulatory provisions. It failed to undertake adequate planning and actions necessary to minimize harm to Aquinnah Cliffs on Martha's Vineyard, the Wampanoag Tribe's historic and cultural homeland. It failed to conduct adequate visual simulations, and assess and

47

resolve adverse effects to Plaintiffs' ceremonial epicenter on the cliffs of Martha's Vineyard overlooking The Project which now degrades this National Historic Natural Landmark.

117. The mitigation measures are legally inadequate and do not satisfy the criteria set forth by Section 110(f).

118. Therefore, without employing all possible planning to reduce harm to Martha's Vineyard and the Ocean Drive National Historic Landmark District, BOEM violated Section 110(f) through authorization of the Project. This approval was arbitrary, capricious and contrary to law. Plaintiffs WAMPANOAG TRIBE OF GAY HEAD – AQUINNAH, NARRAGANSETT INDIAN TRIBE, ELIZABETH VITTON, and SANDRA CRAIG have been and are harmed as a result of the aforesaid.

## THIRD CAUSE OF ACTION

### [Violation of National Environmental Policy Act and Administrative Procedure Act]

119. Plaintiffs hereby incorporate by this reference each paragraph and allegation set forth above.

120. Each of the NEPA violations alleged in this Cause of Action is reviewable under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. BOEM's approval of the Sunrise Wind Project through the Record of Decision and Construction and Operations Plan constitutes final agency action subject to judicial review under 5 U.S.C. § 704. BOEM's failure to take the requisite "hard look," including by omitting required analyses, relying on unsupported assumptions, or failing to consider reasonably foreseeable environmental consequences, constitutes action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A), and action taken without observance of procedure required by law under 5 U.S.C. § 706(2)(D).

121.    The purpose of NEPA is to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. NEPA's fundamental purposes are to guarantee that agencies take a "hard look" at the environmental consequences of their actions before such actions occur.  To conduct a "hard look" the agency in question must (1) carefully consider detailed information regarding the action's potentially significant environmental effects, and (2) make relevant information available to the public so that it may play a role in both the decision-making process and the implementation of the decision itself.  See, e.g., 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1500.1.

122.    For any "major federal action" that "significantly affects" the "human environment," NEPA requires the federal agency in question (here, BOEM) to prepare a detailed EIS that analyzes and discloses the action's environmental consequences.  42 USC § 4332(c); Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989).  If the agency does not conduct this analytical "hard look" prior to the point of commitment, the agency deprives itself of the ability to "foster excellent action."  See 40 CFR § 1500.1(c); Marsh v. Oregon Nat. Resources Council, 490 U.S. 360, 371 (1989).

123.    Relatedly, NEPA requires that the EIS fully analyze all direct, indirect, and cumulative impacts of a proposed federal action or project.  40 CFR § 1502.16.  Direct effects include those "which are caused by the action and occur at the same time and place."  40 CFR § 1508.8(a).  Indirect effects include those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  40 CFR § 1508(b).  Indirect effects may also include growth inducing impacts and other effects that prompt changes in land use patterns, population density or growth rates, and related effects on air and water and other natural systems, including ecosystems.  Ibid.  Cumulative impacts include those which result from

the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over time.  40 CFR § 1508.7.

124.   The inadequacy of BOEM's cumulative analysis is corroborated by the contemporaneous judgment of Rhode Island's own state fisheries advisory body: in August 2023, every member of the Rhode Island Coastal Resources Management Council's Fisheries Advisory Board resigned in protest over the approvals of Revolution Wind, South Fork Wind, and Sunrise Wind, concluding collectively that the CRMC was actively condoning the destruction of the ocean and disregarding expert advisory opinion.

125.   The EIS must provide a complete and accurate discussion of the proposed project's foreseeable environmental impacts, including those that cannot be avoided.  5 USC § 706(2)(D); 40 CFR § 1502.22.  However, when information is incomplete or unavailable, the EIS must "always make clear that such information is lacking." 40 CFR § 1502.22.  And if the missing information can be feasibly obtained and is necessary for a "reasoned choice among alternatives," the agency must include the information in the EIS.  Ibid. Where the cost of the data is too expensive to secure, the agency must still attempt to analyze the impacts in question.  Ibid.

126.   The EIS must provide an accurate presentation of key facts and environmental impacts, as this is "necessary to ensure a well-informed and reasoned decision, both of which are procedural requirements under NEPA."  Natural Resources Defense Council v. U.S. Forest Serv., 421 F.3d 797, 812 (9th Cir. 2005).  An EIS that is incomplete or provides misleading information can "impair[] the agency's consideration of the adverse environmental effects and . . . skew . . . the public's evaluation of the proposed agency action."  Id., at 811.  For this reason, erroneous factual

assumptions and misrepresentations of important facts can fatally undermine the information value of the EIS to the public and decision-makers. Id., at 808.

127. In addition, if the EIS identifies a significant effect, the EIS must propose and analyze "appropriate mitigation measures." 40 CFR § 1502.14; Robertson v. Methow Valley Citizens Council, 490 U.S. at 352-53 ["omission of a reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA"]. Finally, the EIS must examine a reasonable range of alternatives to the proposed action, and focus on those that reduce the identified impacts of that action. 42 U.S.C. § 4332(2)(e); 40 CFR § 1502.1. So important is the alternatives analysis that the Council on Environmental Quality (CEQ) regulations describe it as the "heart" of the EIS. 40 CFR § 1502.14. These same regulations require the agency to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 CFR § 1502.14(a).

128. An EIS must provide a detailed statement of: (1) the environmental impacts of the proposed action; (2) any adverse environmental effects that cannot be avoided should the proposed action be implemented; (3) alternatives to the proposed action; (4) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitment of resources that would be involved in the action should it be implemented. 42 U.S.C. § 4332(C). An EIS must "inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 CFR § 1502.1. NEPA also requires federal agencies, such as BOEM, to analyze the direct, indirect, and cumulative impacts of the proposed action and to take a hard look at those impacts. 40 CFR §§ 1508.7, 1508.8. In addition, NEPA requires federal agencies to consider mitigation measures to minimize the

51

environmental impacts of a proposed action.  40 CFR § 1502.14 (alternatives and mitigation measures); 40 CFR § 1502.16 (environmental consequences and mitigation measures).

## A. BOEM's Structural Analytical Failures Render the Entire FEIS Deficient

### a.   The Nature of BOEM's Failure

129.    The Final Environmental Impact Statement for Sunrise Wind runs hundreds of pages, cites hundreds of studies, and addresses hundreds of public comments. Plaintiffs do not dispute the sheer magnitude of the analysis. What the record demonstrates, however, is that length does not prove analytic rigor. NEPA does not require long documents, it requires an agency to take a hard look, with logical reasoning, at the environmental consequences of its proposed action before committing to it. The question before this Court is not whether BOEM produced a thorough-looking document, but rather did BOEM actually engage with the evidence before it. The record demonstrates it did not.

130.    The failures documented in this cause of action share a common pattern. In each instance, BOEM fails to justify the assumptions foundational to its analysis. The first foundational assumption - that the Project will meaningfully address climate change - is contradicted by BOEM's own FEIS. In the body of the FEIS itself, BOEM states: "The Proposed Action could contribute to a long-term net decrease in GHG emissions due to its use of renewable energy. While this decrease may not be measurable, it would be expected to help reduce climate change to some degree, although any negligible benefit would only last until the Project is decommissioned." FEIS at 3-361.  In a single passage, BOEM characterizes its own climate benefit as unmeasurable, negligible, and temporary. BOEM then used this same unmeasurable, negligible, temporary benefit to justify accepting specific, known, permanent

52

environmental harms to fisheries, benthic habitats, marine ecosystems and multiple endangered species. An agency cannot accept permanent harm in exchange for a benefit it describes in its own document as unmeasurable, negligible, and temporary. That is not a balancing of interests. That is an agency acknowledging, in its own words, that the trade does not make sense - and approving the Project anyway.

131.    Second, BOEM dismisses the No Action Alternative based on a single factual assumption: that if this specific project is not built, the electricity it would have generated will instead be produced by fossil fuels. ROD at 60. Nothing in the record supports that assumption. BOEM's own Appendix E documents that New York is legally required under the Climate Leadership and Community Protection Act to reduce greenhouse gas emissions by 40% below 1990 levels by 2030 and 85% by 2050, and that Massachusetts has equivalent statutory commitments. Appendix E, Table E-4. Approving or rejecting the Sunrise Wind project does not change those legal obligations. Nothing in the record establishes that New York would recruit fossil fuels rather than nuclear power, solar energy, small modular reactors, other offshore wind configurations, or other technologies not yet deployed to satisfy its energy needs. BOEM assumed only fossil fuels would be used, and then relied upon that unexamined assumption to override its own finding that the No Action Alternative would produce fewer adverse environmental impacts in the Project area. An agency that dismisses the environmentally superior alternative by invoking a counterfactual it invented and never examined has not taken a hard look. It has taken a shortcut.

132.    The same assumption infected BOEM's alternatives analysis. It refused to examine alternative clean energy sources. When Plaintiffs raised small modular nuclear reactors and solar energy as alternatives that would meet New York's clean energy mandate without the

53

Project's environmental costs, BOEM dismissed them as outside the scope of the project. FEIS O-188. BOEM cannot invoke the threat of future fossil fuel generation to justify approving this Project's harms while simultaneously refusing to examine whether other clean energy alternatives would satisfy the same need without those harms. If, as the ROD implies, the relevant question is how to meet New York's energy mandate without fossil fuels, then the alternatives analysis must examine all ways of meeting that mandate, not just the applicant's preferred configuration. BOEM defined the purpose of the Project so narrowly that only Sunrise Wind could satisfy it, used the fossil fuel threat to make No Action appear worse, and refused to examine alternative clean energy options, thereby exposing the underlying circular reasoning. That is precisely the kind of purpose-and-need manipulation that courts have rendered analysis legally insufficient. (Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 196 (D.C. Cir. 1991).

133.    The no-action alternative, which should serve as a clean comparative baseline against which the Project's specific environmental contribution can be measured, was instead constructed to absorb the environmental damage of virtually every ongoing and anticipated human activity in the region. BOEM incorporated into the no-action baseline all current and foreseeable future offshore wind projects, undersea infrastructure, tidal energy development, marine mineral extraction, military operations, marine transportation, fisheries activity, oil and gas operations, onshore development, and the projected effects of global climate change. FEIS Appendix E at E-2. This construction simultaneously defeats two independent NEPA requirements. First, it defeats the cumulative impact analysis: by absorbing all prior and future project damage into the baseline, BOEM ensures that no individual project can ever appear to cause significant marginal harm, because the harm has already been counted as background.

Second, it defeats the alternatives analysis: a no-action alternative that has been pre-loaded with nearly as much anticipated environmental damage as the Proposed Action itself is not a meaningful comparator. It is a straw man. An alternatives analysis that measures the Proposed Action against a pre-degraded no-action baseline cannot perform its legal function of forcing genuine consideration of whether the proposed action is the best available choice. The Council on Environmental Quality's regulations describe the alternatives analysis as the heart of the EIS precisely because it is supposed to discipline agency decision-making. BOEM's baseline construction removed that discipline entirely - from both the cumulative analysis and the alternatives analysis simultaneously.

134.    This methodology has not only infected the review of Sunrise Wind. It has been applied to every offshore wind project reviewed on the Atlantic Outer Continental Shelf, each one evaluated against a baseline already degraded by its predecessors, each one appearing to cause only marginal additional harm. The cumulative consequence of that sequential approval process - the aggregate transformation of a marine ecosystem that supports critically endangered species - has never been assessed by any agency in any document.

135.    Beyond its foundational assumptions, BOEM failed to engage with the specific scientific evidence Plaintiffs submitted. The failures that follow are not scientific disputes requiring the Court to choose between competing experts. They are failures of reasoning — instances where BOEM cited a study for the opposite of what it concluded, responded to a question the commenter did not ask, or dismissed a documented concern with an assertion that contradicts its own record. A court does not need expertise in marine biology or oceanography to identify these failures. It needs only to read BOEM's citations against what BOEM claims they say. These are precisely the kinds of failures the arbitrary-and-capricious standard exists to catch.

136.    The structural deficiencies identified above - a purpose-and-need statement that forecloses genuine alternatives, the use of projected climate change harms to justify known project-specific harms, and a baseline that absorbs the environmental damage of every prior and future project in the regional build-out - are not independent errors. They operate together to produce an EIS that is incapable of informing either the agency's decision or the public's meaningful participation in it. NEPA's core purpose is to ensure that federal agencies take a hard look at environmental consequences before acting, and to guarantee the public a genuine opportunity to evaluate and respond to that analysis. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989). An EIS that defines alternatives out of existence, absorbs project-specific impacts into a regional baseline, and deflects documented environmental harms onto climate change does not take a hard look. It performs the appearance of one. Where structural deficiencies are so pervasive that they infect the document's foundational analytical framework, the appropriate remedy is remand of the entire FEIS - not piecemeal correction of individual errors. The result here is a framework that renders NEPA's alternatives analysis and cumulative impact requirements a nullity - not through any single act of bad faith, but through an analytical structure that makes meaningful environmental review of sequential development impossible by design. The specific failures documented in the paragraphs that follow are the symptoms. This structural deficiency is the disease.

### b.  The Ocean SAMP Process Was Institutionally Compromised and BOEM Adopted Its Outputs Without Independent Validation

137.    The Ocean SAMP process was structurally compromised by a preferred developer arrangement and developer-funded SAMP work.

138.    Rhode Island entered into a "Joint Development Agreement" ("JDA") with

Deepwater Wind ("DWW") concerning offshore wind development within the Rhode Island Ocean Special Area Management Plan ("Ocean SAMP").

139.    Under the JDA, the State (through its Department of Administration) designated DWW as the State's "preferred developer of offshore wind power within the SAMP."

140.    The State further agreed that, while the JDA remained in effect (and until DWW completed a "Fully Developed Project for Phase II"), the State would "object in any appropriate state or federal forum" to any offshore wind project or transmission facility - inside or outside the SAMP - that would "interfere with" DWW's project.

141.    The JDA also obligated the CRMC to "adopt the SAMP," to "expedite" the SAMP, and for the State to "advocate on behalf of the Project, where appropriate, with "Federal Agencies and State Agencies."

142.    The JDA provided that the "SAMP Studies" (plans, analyses, studies, reports, surveys, assessments, and other work product developed/produced/commissioned by CRMC/State representatives/URI in connection with the SAMP) would be owned by CRMC, but the State would grant DWW a "non-exclusive, perpetual license" to use those SAMP studies "for any purpose in connection with the Project."

143.    The JDA required DWW to reimburse the State for SAMP costs "reasonably expended" by CRMC up to $3.2 million, including a requirement that DWW deposit $3.2 million under an escrow agreement for reimbursing CRMC/URI SAMP expenditures.

144.    BOEM's early coordination with Rhode Island and Massachusetts shows federal awareness and involvement in the offshore wind call-area / planning process that fed the SAMP baseline.

145.    BOEM convened/participated in the "BOEMRE Rhode Island & Massachusetts

Renewable Energy Task Force Teleconference" on June 3, 2011, with participation by the Executive Director of the Rhode Island CRMC and others.

146. The task force materials reflect that federal agencies (including NMFS) provided comments and recommended language concerning offshore wind planning issues, including areas "important for commercial and recreational fishing" and "complex marine habitat," specifically referencing Cox Ledge.

147. The task force materials likewise show that BOEM contemplated NEPA environmental review steps in connection with call-area planning (including "Notice of Intent to prepare Environmental analysis pursuant to NEPA").

148. On August 31, 2023, members of the Rhode Island Fisherman's Advisory Board ("FAB") resigned en masse and refused to participate further in the Ocean SAMP process, stating that CRMC had made "deference to offshore wind developers its top priority," and that the process had been reduced to "mere political theater."

149. The FAB resignation letter further asserts that "concurrence decisions are made ahead of time," that FAB expertise is dismissed as "anecdotal," and that developers were "free to provide misinformation with impunity," while staff downplayed impacts.

150. The FAB resignation letter also describes alleged condoning of construction impacts (including "plowing of glacial moraine"), alleged "decimation of cod spawning grounds," and significant long-term impacts to Rhode Island's fishing industry, all in conflict with Ocean SAMP environmental protections and enforceable policy.

151. Rich Hittinger resigned as the recreational fishing representative on the FAB effective immediately, describing CRMC's approach to conflicts between major coastal/marine developments and existing recreational fishing uses.

152. Hittinger specifically references approval of Cox Ledge development and "the most recent approval of Sunrise Wind in a very active area for recreational tuna fishing," describing that recreational fishing interests would be changed "dramatically."

153. Hittinger states approvals were granted under the "guise" that there was no recreational fishing conflict because the responsible entities "did not produce any data documenting recreational use," despite requests for surveys/observation to identify and mitigate conflicts; he asserts CRMC never required those studies to be completed and that conflicts were therefore never evaluated.

154. Therefore, BOEM's analysis and approval of Sunrise Wind was arbitrary and capricious because BOEM materially relied on the Rhode Island Ocean SAMP and/or SAMP-derived products as a foundational predicate for siting, avoidance/mitigation assumptions, and impact conclusions, even though the record demonstrates the Ocean SAMP process and outputs were structurally compromised by (a) Rhode Island's designation of a preferred offshore wind developer and agreement to object to competing projects in state or federal fora, and (b) developer-funded SAMP work and reimbursements that created institutional incentives to expedite and advocate for the developer's project.

155. BOEM failed to independently validate, critically evaluate, or otherwise "hard look" review key SAMP-derived assumptions and inputs despite the fact that CRMC's Ocean SAMP implementation was not functioning as an objective or scientifically reliable decision-support tool, including the mass resignation of the FAB describing predetermined outcomes, dismissal of fishery expertise, and tolerance of misinformation.

156. BOEM's errors were prejudicial because they infected the assessment of the affected environment, the significance analysis, the range of alternatives, and the mitigation

assumptions embedded in the decision. BOEM's uncritical reliance on a structurally compromised baseline, without independent validation or acknowledgment of the SAMP's institutional deficiencies, renders the ROD and FEIS arbitrary and capricious under 5 U.S.C. § 706(2)(A), as the agency failed to consider an important aspect of the problem and relied on factors Congress did not intend it to consider.

157.    The Sunrise Wind lease area was initially part of the region that now houses both Revolution Wind and South Fork Wind, yet BOEM allowed the lease area to be segmented into three smaller projects, for the approval process. This segmentation violates NEPA's requirements.

### c.    BOEM Defined the Alternatives Analysis Too Narrowly to Permit Meaningful Environmental Review

158.    NEPA requires that the alternatives analysis be "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. An agency must "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action, and must "devote substantial treatment to each alternative considered in detail." Id. The alternatives section exists to ensure that decision-makers and the public can evaluate whether the proposed action is the best available means of achieving the agency's legitimate objectives - or merely the applicant's preferred option dressed in regulatory clothing. Where an agency defines its purpose and need so narrowly that only the applicant's preferred alternative can satisfy it, the alternatives analysis is a sham and the EIS fails as a matter of law. Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 196 (D.C. Cir. 1991); Simmons v. U.S. Army Corps of Engineers, 120 F.3d 664, 666 (7th Cir. 1997). The Sunrise Wind FEIS commits exactly this error.

159.   BOEM defined the purpose of the Proposed Action as providing "a commercially viable offshore wind energy project within the Lease Area to help New York achieve its renewable energy goals." FEIS 1.2. By anchoring the purpose to a specific lease area already committed to a specific developer, BOEM guaranteed that no alternative sited outside that lease area - regardless of its environmental superiority - could satisfy the stated purpose. When Plaintiffs submitted comments requesting that BOEM examine alternatives that help meet New York's clean energy goals while avoiding environmentally sensitive hard-bottom habitat, or alternatives using other renewable technologies such as small-scale nuclear or solar, BOEM dismissed both with a single sentence: nuclear and solar are "not within the scope of this Project." FEIS Appendix O at O-188. This response confuses the scope of the applicant's proposal with the scope of BOEM's independent NEPA obligation. NEPA does not require BOEM to approve what the applicant wants. It requires BOEM to evaluate what the public interest demands. An alternatives analysis confined to variations within a single pre-committed lease area is not the rigorous exploration NEPA requires. Davis v. Mineta, 302 F.3d 1104, 1119 (10th Cir. 2002).

160.   BOEM's sole response to Plaintiffs' challenge to the no-action alternative was: "The No Action Alternative is a viable alternative. New York's energy goal does not mean this Project will move forward." FEIS Appendix O at O-459. That response does not engage with the legal question. As established above, the no-action alternative as BOEM constructed it does not describe what would actually happen if this Project were not approved. It describes a counterfactual world in which New York abandons its legally binding clean energy mandate. That world does not exist, and a no-action alternative built around it cannot serve as the

meaningful benchmark NEPA requires. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989).

161.    BOEM also used scientific uncertainty as a reason to avoid analysis rather than as a reason for caution. When Plaintiffs raised concerns about deoxygenation and plankton disruption, BOEM acknowledged that wind farms "do likely influence stratification, nutrients, and primary productivity" but declined to analyze the Project's specific impacts because "actual impacts in the Mid-Atlantic Bight are currently unknown." FEIS Appendix O at O-306. NEPA does not permit that response. Where information is incomplete or unavailable, the EIS must acknowledge that gap and still attempt to analyze the impacts in question. 40 C.F.R. § 1502.22. Uncertainty is a reason for a harder look, not a substitute for one. By acknowledging the mechanism while refusing to assess its consequences, BOEM did not take a hard look at a significant environmental concern. It documented the concern and walked away from it.

162.    BOEM's response to Plaintiffs' demand for analysis of multi-stressor interaction effects was to assert that the Sunrise Wind EIS tiers to and incorporates by reference regional programmatic assessments. Tiering is a legitimate NEPA tool when the programmatic document has already resolved the questions being raised. Kleppe v. Sierra Club, 427 U.S. 390, 409-10 (1976). It is not a mechanism for avoiding analysis of issues the programmatic documents never addressed. California v. Block, 690 F.2d 753, 761 (9th Cir. 1982). None of the programmatic documents BOEM identified address the specific interaction effects Plaintiffs raised - the combined effects of biofouling, deoxygenation, sediment resuspension, trace element contamination, and prey depletion acting simultaneously on a critically endangered species in a single geographic area. Plaintiffs submitted peer-reviewed literature identifying the absence of multi-stressor interaction analysis as a recognized global gap in offshore wind environmental

assessment.[18] BOEM did not respond to that citation. Where the programmatic record is silent on the precise issues raised, tiering is not an answer. It is an evasion.

163.    The Cumulative Incidental Take Authorizations Quantify the Consequence. The magnitude of BOEM's cumulative impacts failure is illustrated with particular clarity by the incidental take authorization data submitted to NMFS in connection with the nine offshore wind projects currently under review for the same geographic region, including the Project. Across those nine projects, NMFS has been asked to authorize the taking of 274% of the North Atlantic right whale population - a species with an estimated 334 individuals remaining that is functionally projected to reach extinction by 2040 at current rates of decline - along with 202% of the humpback whale population, 163% of the common dolphin population, 58% of the endangered fin whale population, and over 100% of several other dolphin stocks. Fifteen active incidental take authorizations for wind development activities in New England waters already authorize the taking of 67% of the North Atlantic right whale population before the Project's contribution is added.

164.    These figures, derived from NMFS's own submissions and regulatory filings, are not projections of harm arising from a single project in isolation; they are the arithmetic consequence of evaluating each project in a vacuum rather than programmatically. They make concrete what NEPA's cumulative impacts requirement is specifically designed to prevent: agency action that, considered project by project, appears incremental, but that, considered as a whole, authorizes the functional destruction of entire marine mammal populations. The FEIS contains no analysis of the combined incidental take burden across co-located projects; no

---

[18] Ibon Galparsoro et al., Reviewing the Ecological Impacts of Offshore Wind Farms, 1 npj Ocean Sustainability 3 (2022), https://doi.org/10.1038/s44183-022-00003-5.

evaluation of whether the North Atlantic right whale or any other affected species can sustain even a fraction of the authorized takes in light of ongoing Unusual Mortality Events and precipitous population declines; and no programmatic assessment that would allow decision-makers or the public to evaluate the aggregate consequences of the regional wind buildout. This is precisely the "segmented" analysis NEPA prohibits. Its failure to consider these cumulative impacts renders the FEIS and ROD arbitrary and capricious under 5 U.S.C. § 706(2)(A).

**B. BOEM Failed to Take a Hard Look at Impacts on Marine Primary Productivity and the North Atlantic Right Whale**

165.    The significance of BOEM's failure to analyze impacts on primary productivity and benthic habitat cannot be understood in isolation. Marine ecosystems are structured from the bottom up - primary producers form the irreplaceable foundation upon which all higher trophic levels depend. Reductions in primary productivity produce multiplicative effects throughout the entire food web. This is not a contested scientific proposition - it is among the most fundamental principles of marine ecology. The North Atlantic Right Whale depends on dense aggregations of Calanus finmarchicus whose abundance is directly tied to primary productivity in the waters affected by the Project area. Commercial fish species depend on larval prey availability likewise tied to primary production. Harmful algal blooms are triggered by disruptions to the nutrient dynamics primary producers regulate. Deoxygenation results from the disruption of the oxygen production they sustain. Each of these harms, some of which BOEM analyzed as separate independent line items throughout the FEIS, is in reality a downstream consequence of the same foundational disruption: the degradation of primary productivity and benthic ecosystem function at the base of the marine food web. By treating these interconnected impacts as independent categories rather than as expressions of a single foundational harm, and by characterizing

64

cumulative benthic impacts as merely "moderate adverse" without analyzing what that means for every trophic level above, BOEM failed to take the hard look NEPA requires and failed to ensure the environmental protection OCSLA's mandatory M-37059 standard demands.

166. BOEM also failed to take a hard look, required by NEPA, at the operational entrainment impacts of the Offshore Converter Substation (OCS-DC) Cooling Water Intake Structure (CWIS). The HVDC converter station approved for Sunrise Wind will withdraw up to 7.8 million gallons per day (MGD) of seawater to cool the converter station. The open loop cooling system will discharge that seawater as thermal effluent at temperatures ranging from 86¬∞F to 90¬∞F, after injecting it with sodium hypochlorite, (bleach created through electrolysis,) directly affecting the Southern New England waters, including the NOAA designated Habitat Area of Particular Concern (HAPC). This will result in an estimated 2.8 billion gallons of seawater turned effluent annually and will operate continuously for the lifetime of the project. Everything, from plankton, fish larvae, and even small fish caught up in by the system will be killed if not from the high temperature, then from the biocidal activity of the bleach.

167. BOEM approved the Project without ensuring that EPA applied the Best Technology Available (BTA) standard mandated by CWA § 316(b), despite the fact that the Project's cooling water withdrawal of up to 7.8 MGD far exceeds the 2 MGD threshold that triggers that standard and is the first of its kind to be constructed in U.S. waters. The CWA mandates that new facilities withdrawing more than 2 MGD of cooling water must comply with BTA to minimize entrainment and impingement of aquatic organisms. The Sunrise Wind project exceeds this threshold and should be subject to BTA for its cooling system. However, the EPA applied Best Professional Judgment (BPJ), which bypasses the CWA's environmental protections

and introduces the risk of adverse impacts to marine life. Best Professional Judgment is a gap-filling tool EPA uses when no categorical BTA standard exists. It does not apply where, as here, § 316(b) mandates BTA for new facilities exceeding the statutory threshold. BOEM's acceptance of this violation is arbitrary and capricious under the Administrative Procedures Act (APA § 706,) as it ignored the mandatory statutory requirements and failed to assess the thermal discharge and chemical release impacts, especially on vulnerable species like Atlantic cod larvae and other species affected by the HAPC designation.

168.    NOAA established the area that includes the Sunrise Project lease area a Habitat Area of Particular Concern (HAPC) on March 6, 2024, prior to BOEM's approval of the ROD. The HAPC designation was based on the area's importance to critical habitats for multiple species, including Atlantic cod, Atlantic herring, sea scallops, little skate, monkfish, ocean pout, red hake, winter flounder, and winter skate. These species depend on complex habitats for spawning, feeding, and shelter during their early life stages, and BOEM's failure to protect them through a comprehensive review of the Sunrise CWIS's impact has the potential to cause significant ecological harm, violating OCSLA, NEPA, and the CWA.

169.    The FEIS does not contain an independent agency analysis of CWIS entrainment impacts. Instead, BOEM relied entirely on a developer-prepared Ichthyoplankton Entrainment Assessment submitted as part of the Construction and Operations Plan, without commissioning independent verification, requiring project-specific field studies, or evaluating the cumulative entrainment impacts of multiple offshore converter stations operating simultaneously in the same lease area.

170.    The developer's own assessment projects the annual destruction of approximately 2,941,824 fish larvae, 29,418,238 fish eggs, and over 8 billion zooplankton through the OCS-DC CWIS, assuming 100% mortality of entrained organisms.  Among the zooplankton entrained, the assessment identifies approximately 1,100,564,690 Calanus finmarchicus killed annually  - the primary prey species of the critically endangered North Atlantic Right Whale (NARW).

171.    According to NOAA, the 334 remaining NARWs bear all of the hallmarks of malnutrition, including smaller size, low calving rates, poorer health, longer duration between pregnancies, and remaining in the northern waters where their prey resides throughout the winter, rather than migrating to warmer waters where prey is less abundant, as has been their custom for millions of years. Lactating females suffer the worst malnutrition. BiOp at 60. Poor female health is linked to malnutrition from low prey availability, which impairs reproduction. BiOp at 62-63.NARW's are obligate feeders on Calanus finmarchicus. Reducing the availability of this  zooplankton, could have profound affects on the reproductive rates and therefore the survival of the species.

172.    NOAA acknowledged that the converter-station intake would entrain "over 1.1 billion Calanus finmarchicus annually," and that it was evaluating "the effects of the loss of potential prey species for whales." BiOp at 371. It further recognized elsewhere that North Atlantic right whales are prey-limited, in poor body condition, and experience reduced calving when prey availability declines due to poor nutrition. BiOp at 61. Yet the Biological Opinion did not analyze how the removal of billions of individuals of a primary prey species may affect an already nutritionally stressed population. Instead, it concluded that the loss would be "undetectable from natural variability," relying on an assumption of even distribution across the lease area. That assumption directly contradicts NOAA's own scientific findings that right

67

whales depend on dense, spatially concentrated copepod patches. By relying on this flawed analysis, BOEM acted arbitrarily and capriciously in relying on the Biological Opinion. This reflects a failure to take the "hard look" required by NEPA and is inconsistent with OCSLA's mandate that the Secretary ensure protection of the environment and the MMPA's requirement to safeguard the health and survival of endangered marine mammals.

173.    Neither BOEM nor EPA evaluated these discharge impacts under Clean Water Act § 316(b), which specifically requires that cooling water intake structures reflect the best technology available to minimize adverse environmental impact. BOEM cannot affirmatively ensure protection of the environment under OCSLA § 8(p)(4)(A) and (B) while approving a structure whose discharge consequences under applicable federal water quality law were never independently evaluated. This failure constitutes an additional and independent basis on which BOEM's approval is arbitrary and capricious under 5 U.S.C. § 706(2)(A) and taken without observance of procedure required by law under 5 U.S.C. § 706(2)(D).

174.    BOEM's failure to independently evaluate CWIS entrainment impacts, analyze alternatives to open-loop cooling, assess cumulative entrainment effects across co-located offshore wind projects, or disclose the ecological significance of projected annual losses of billions of zooplankton and tens of millions of fish early life stages constitutes a failure to take the hard look required by NEPA, and renders the FEIS and ROD arbitrary and capricious under 5 U.S.C. § 706(2)(A) and taken without observance of procedure required by law under 5 U.S.C. § 706(2)(D).

175.    All of the turbines and the offshore converter station in the Sunrise Wind Farm lease area will introduce extensive new submerged hard surface area on which filter-feeding

sessile invertebrates - including mussels, barnacles, and ascidians - will colonize, a process known as biofouling. Peer-reviewed scientific literature available to BOEM at the time of the FEIS and ROD establishes that this process poses a substantial, quantifiable threat to primary productivity. Malerba, White, and Marshall (2019)[19]. The authors report that biofouling consumes between 40 and 95 percent of the total primary production in the surrounding water column each day. Each square meter of artificial structure can negate the primary production of up to 130 square meters of surrounding coastal waters, creating a trophic footprint that dwarfs the physical footprint of the structures themselves. These estimates are expressly conservative, as the authors note that actual trophic footprints are likely at least double those calculated.

176.    Plaintiffs raised the findings of Malerba et al. (2019) in their comments on the Draft Environmental Impact Statement and in their comments on the Incidental Take Requests submitted to NOAA Fisheries. FEIS, O-385 and Comment . Neither BOEM in the FEIS and ROD nor NOAA Fisheries in the relevant biological analyses substantively addressed or responded to this scientific concern. The complete failure to analyze the biofouling trophic footprint of a project deploying 94 turbine foundations and an offshore converter station across a productive offshore ecosystem - in the face of peer-reviewed scientific literature specifically identifying this mechanism as a significant and quantifiable environmental threat - constitutes a failure to take the hard look required by NEPA, renders BOEM's approval arbitrary and capricious under 5 U.S.C. § 706(2)(A), and constitutes action taken without observance of procedure required by law under 5 U.S.C. § 706(2)(D).

---

[19] Malerba, M.E., White, C.R., and Marshall, D.J. (2019). The outsized trophic footprint of marine urbanization. Frontiers in Ecology and the Environment, doi:10.1002/fee.2074.

177.    Phytoplankton and zooplankton constitute the foundational base of the marine food chain upon which commercially and ecologically significant species in the Sunrise Wind lease area - including the North Atlantic Right Whale - depend. The FEIS contains no analysis of the biofouling-driven reduction in primary productivity that the Project's 94 turbine foundations and offshore converter station will generate. It contains no cumulative assessment of the combined trophic footprint of Sunrise Wind together with the adjacent Revolution Wind and South Fork Wind projects operating on the same marine ecosystem. And it contains no evaluation of what these losses mean for the fishery and marine mammal resources the Project will affect over its 25-to-35-year operational life. Each omission is an independent hard-look failure. Together, they establish that BOEM approved a project of multi-decade duration and ecosystem-scale consequence without ever asking what it would cost the food web.

178.    Instead, BOEM characterized turbine biofouling as an "artificial reef effect" producing net ecological benefits, relying primarily on monitoring data from the Block Island Wind Farm ("BIWF"). FEIS at 3-49, 3-152, 3-168. BOEM acknowledged in the same document that BIWF uses jacket foundations while Sunrise Wind will use monopiles. Monopiles are a structurally distinct design. FEIS at 3-49. BOEM provided no analysis of whether biofouling rates or filter-feeding biomass on monopiles are comparable to those on jacket structures. Transferring BIWF results to a different foundation type without supporting analysis is arbitrary and capricious.

179.    BOEM's ROD relied on NOAA Fisheries' Biological Opinion to satisfy its obligation to ensure the Project would not jeopardize listed species, including the North Atlantic Right Whale. That reliance was not reasonable. The BiOp approved an ITR application containing the assertion that "wakes in water currents created by the presence of the foundations

70

are not expected to affect pelagic fish, plankton, or benthic species" - a statement the BiOp itself contradicts. An agency ROD that rests on a biological opinion containing internal contradictions lacks the rational basis the APA requires. State Farm, 463 U.S. at 43.

180.    The contradiction is not subtle. While the ITR application stated that foundation wakes were "not expected to affect" plankton, the BiOp acknowledged "localized changes in plankton distribution and abundance" extending up to 300 meters downstream of each foundation. BiOp at 365. Plaintiffs raised four peer-reviewed studies in their ITR comments directly contradicting the ITR application's assertion - Malerba et al. (2019),[20] Daewel et al. (2022),[21] Dorrell et al. (2022),[22] and Wang et al. (2022).[23] Neither the BiOp nor the ROD responded to those studies. BOEM cannot satisfy its hard-look obligation by adopting without scrutiny a biological opinion that ignores science placed in the administrative record.

181.    Beyond BOEM's reliance on a self-contradicting BiOp, the agency's underlying failure is compounded by NOAA's own response to Plaintiffs' comments. As set forth above, Plaintiffs submitted the same four peer-reviewed studies to NOAA Fisheries in their ITR comments, NOAA-NMFS-2023-0012-0581. NOAA Fisheries did not respond to this comment in the Federal Register. That silence is independently arbitrary and capricious. Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n, 896 F.3d at 536 (D.C. Cir. 2018).

---

[20] Martino E. Malerba, Craig R. White & Dustin J. Marshall, The Outsized Trophic Footprint of Marine Urbanization, Front. Ecol. Environ. (2019), https://doi.org/10.1002/fee.2074.

[21] Ute Daewel et al., Offshore Wind Farms Are Projected to Impact Primary Production and Bottom Water Deoxygenation in the North Sea, 3 Commun. Earth Environ. 292 (2022), https://doi.org/10.1038/s43247-022-00625-0.

[22] Robert M. Dorrell et al., Anthropogenic Mixing in Seasonally Stratified Shelf Seas by Offshore Wind Farm Infrastructure, 9 Front. Mar. Sci. 830927 (2022), https://doi.org/10.3389/fmars.2022.830927.

[23] Teng Wang et al., Zooplankton Community Responses and the Relation to Environmental Factors from Established Offshore Wind Farms within the Rudong Coastal Area of China, 34 J. Coastal Res. 843 (2018), https://doi.org/10.2112/JCOASTRES-D-17-00058.1.

182.    The BiOp's dismissal of wake effects also rests on an internally incoherent use of authority. To confine plankton disruption to 300 meters, the BiOp relied on Floeter et al. (2017), a study of tripod and tri-pile foundations. BiOp at 365-366. The BiOp simultaneously acknowledged that monopile foundations, the very design Sunrise Wind uses, may produce a wake effect longer than tripod foundations. If monopile wakes extend further than tripod wakes, the Floeter 300-meter figure understates rather than bounds the effect. The BiOp applied a study of a different foundation type to minimize concerns, then acknowledged the distinction cuts in the wrong direction. BOEM's reliance on this reasoning to support its ROD was unreasonable.

183.    Plaintiffs' ITR comment specifically raised the cumulative energetic consequences for baleen whales of altered prey availability over the Project's 25-to-35-year operational life. NOAA did not address that argument. The BiOp acknowledges that prey availability directly affects right whale calving rates and survival. BiOp at 3042-3093. It does not connect that acknowledgment to the plankton disruption findings in the same document. The failure to trace the analytical chain from foundation wakes to plankton disruption to prey availability to right whale energetics - across a multi-decade project operating in documented right whale foraging habitat - is a hard-look failure independent of the errors in 142-146.

184.    Finally, offshore wind developers are operating under a materially less rigorous regulatory framework for anti-corrosive coatings than offshore oil and gas, not because the coatings differ, but because agencies have failed to account for scale, density, and duration. Federal agencies have long regulated corrosion coatings on oil and gas platforms as part of an industrial system involving limited numbers of structures, site-specific impacts, and discrete maintenance cycles.

185.    Offshore wind, by contrast, entails the installation of thousands of turbines over short timeframes in dense lease areas, each coated with multi-layer epoxy and polymer systems designed to persist for decades in high-energy marine environments. Yet the agencies have treated these coatings as benign "design features," declining to quantify coating mass, model abrasion or chalking, evaluate cumulative material release, or assess long-term ecological exposure.

186.    This failure to analyze the cumulative and reasonably foreseeable environmental effects of turbine coatings violates NEPA's "hard look" requirement and OCSLA's mandate that the Secretary ensure activities are conducted in a manner that prevents environmental harm, rather than assuming that materials acceptable at oil-and-gas scale remain acceptable when deployed by the thousands across the Outer Continental Shelf.

187.    The environmental analyses improperly rely on offshore oil and gas precedent to justify the use of anti-corrosive coatings on offshore wind turbines without evaluating whether that precedent remains valid at wind-farm scale. Oil and gas platforms exist in relatively small numbers, are widely spaced, and are subject to continuous inspection and maintenance regimes that limit cumulative material release. Offshore wind projects, by contrast, involve the near-simultaneous installation of hundreds to thousands of coated structures within concentrated lease areas, creating a fundamentally different exposure profile.

188.    The EIS failed to evaluate whether degradation or leaching from these coatings could contaminate marine life and seafood, harming the fishermen and their organizations who are members of Green Oceans, and the members of Green Oceans who consume local seafood as a part of the cultural and economic interests they share in the Ocean.

189. The agencies failed to quantify coating volumes, assess abrasion rates in splash-zone environments, or aggregate expected material degradation across the life of the projects. By ignoring scale-driven effects, the agencies unlawfully segmented their analysis and failed to consider cumulative impacts as required by NEPA. This failure to quantify, model, or aggregate the environmental effects of anti-corrosive coatings at offshore wind scale, despite the availability of relevant data and the foreseeability of cumulative harm, constitutes a failure to take the hard look required by NEPA and renders BOEM's approval arbitrary and capricious under 5 U.S.C. § 706(2)(A), and taken without observance of the procedural requirements of NEPA under 5 U.S.C. § 706(2)(D).

190. Turbine blades operating in the offshore marine environment undergo progressive leading-edge erosion, a well-documented process by which the epoxy and polymer composite materials of the blade surface degrade and shed particulate matter into the surrounding water column. Peer-reviewed scientific literature available to BOEM at the time of the FEIS establishes that this process releases microplastics containing Bisphenol A and per- and polyfluoroalkyl substances sometimes called forever chemicals (PFAs) because they do not biodegrade, into the marine environment. Once released, these compounds enter and accumulate in the marine food chain, posing risks to marine organisms and to humans who consume locally harvested seafood.

191. The FEIS contains no analysis of the rate, volume, or spatial extent of blade erosion-derived microplastic and chemical release; no assessment of the potential for PFAS and BPA to bioaccumulate or biomagnify in commercially and ecologically significant species within the Sunrise Wind lease area; no evaluation of the risk to human health posed by contamination of local seafood; and no consideration of the cumulative chemical loading that will result from the

simultaneous operation of Sunrise Wind, Revolution Wind, and South Fork Wind within the same ecosystem. Plaintiffs, including commercial fishermen whose livelihoods depend on the marketability of local catch and Green Oceans members who consume locally harvested seafood, face direct and concrete harm from these unanalyzed impacts. BOEM's failure to analyze the foreseeable environmental and human health consequences of blade erosion-derived chemical contamination constitutes a failure to take the hard look required by NEPA, renders the FEIS and ROD arbitrary and capricious under 5 U.S.C. § 706(2)(A), and constitutes action taken without observance of procedure required by law under 5 U.S.C. § 706(2)(D).

192. BOEM further failed to take the hard look required by NEPA with respect to sulfur hexafluoride emissions from the Project. The FEIS acknowledges that the Project's turbines and substations will house significant quantities of SF6 and that SF6 leaks during normal operations. Yet the FEIS contains no meaningful analysis of the Project's SF6 emission profile, no quantification of its greenhouse gas contribution, and no evaluation of mitigation alternatives, such as the substitution of SF6-free components, that would eliminate this risk.

193. This omission is particularly significant because SF6 has a global warming potential approximately 23,500 times greater than CO2 over a 100-year horizon, making each molecule of leaked SF6 vastly more harmful to the global climate than a molecule of the fossil-fuel emissions the Project purports to offset. Executive Order 14008, which BOEM cites as the purpose and need for the Project, expressly requires that the effort to combat climate change protect the climate both at home and abroad.  An environmental review that ignores a known, ongoing source of a potent greenhouse gas inherent in the Project's design cannot satisfy NEPA's hard- look requirement and cannot honestly claim to fulfill the mandate of Executive

Order 14008. This failure renders the FEIS and ROD arbitrary and capricious under 5 U.S.C. § 706(2)(A).

194.    BOEM also failed to take the hard look required by NEPA with respect to the Project's reasonably foreseeable role in promoting harmful algal blooms in the surrounding marine environment. The FEIS does not analyze the mechanism by which filter-feeding invasive organisms colonizing the Project's turbine foundations — artificial reef structures that BOEM elsewhere acknowledges will be colonized by benthic invertebrates — can alter nutrient dynamics in the surrounding water column in ways that promote HABs.

195.    This mechanism is not speculative. Studies from the North Sea document that offshore wind installations have been associated with changes in water oxygenation and nutrient availability that correlates with increases in harmful algal blooms. In the year following construction of the Block Island Wind Farm, a HAB contaminated shellfish in Narragansett Bay with domoic acid, a deadly neurotoxin, with changes in nutrient levels correlating to toxicity. In the late fall and early winter of 2021, a toxic algal bloom caused a catastrophic die-off of crabs and lobsters along England's North Sea coast in the vicinity of the Hornsea 1 and 2 wind farms. HABs carry an estimated annual financial burden to the United States economy of over eight billion dollars and pose direct threats to seafood safety and public health. The Project area is located in waters historically supporting Rhode Island's commercial shellfish and fin-fish industries, on which Plaintiff fishermen and Green Oceans members who consume local seafood depend. The FEIS contains no analysis of the risk of HABs attributable to the Project; no evaluation of the potential for shellfish contamination and violation of applicable Seafood Safety Regulations, 21 C.F.R. § 123; no assessment of the economic impact on the commercial fishing

industry; and no cumulative analysis of the combined HAB risk from Sunrise Wind together with the adjacent Revolution Wind and South Fork Wind projects on the same ecosystem. This failure to analyze a foreseeable, documented, and economically significant harm constitutes a failure to take the hard look required by NEPA and renders BOEM's approval arbitrary and capricious under 5 U.S.C. § 706(2)(A).

196.    BOEM failed to take the hard look required by NEPA with respect to the resuspension of legacy toxic contaminants from seafloor sediments within the Project lease area. The waters off Rhode Island received decades of industrial discharges and runoff during the industrial era, and the seafloor sediments within and around the Sunrise Wind lease area contain elevated concentrations of heavy metals, PCBs, and other persistent toxic compounds that have settled and remained largely sequestered in the seabed.

197.    Construction activities, including the installation of turbine foundations by impact pile driving, will initially disturb and resuspend these legacy contaminants. Thereafter, the continuous tidal and estuarine currents deflecting around the submerged portions of the turbine foundations will create ongoing sediment disturbance throughout the 25–35-year operational life of the Project, introducing toxic compounds into the water column on a sustained basis. Through bioaccumulation and biomagnification, these compounds will concentrate as they move up the food chain, with the potential to contaminate commercially harvested species including the scup, squid, shellfish, and ground fish on which Plaintiff fishermen and Green Oceans members who consume local seafood depend. The FEIS contains no adequate analysis of the nature and concentration of legacy contaminants in the lease-area sediments; no modeling of resuspension rates and plume dynamics during construction or operations; no assessment of bioaccumulation potential in commercially and ecologically significant species. This failure to analyze a

foreseeable, scientifically documented harm to human health and the marine food chain constitutes a failure to take the hard look required by NEPA and renders BOEM's approval arbitrary and capricious under 5 U.S.C. §706(2)(A).

198.   Finally, BOEM failed under NEPA to take the requisite hard look at the reasonably foreseeable risk and environmental consequences of turbine blade failure at Sunrise Wind, including the discharge of blade debris and other pollutants into the offshore environment.

199.   There is no meaningful analysis in the FEIS, ROD, COP approval, or other BOEM compliance documents of blade breakage, detachment, or fragmentation; the resulting dispersal of marine trash and debris; the environmental effects on marine mammals, fish, birds, benthic habitat, navigation, fishing, and shorelines; or the adequacy of monitoring, containment, retrieval, and response measures.

## PRAYER FOR RELIEF

200.   Plaintiffs ask the Court for the following relief:

201.   An order holding unlawful, vacating, and setting aside Defendants' March 25, 2024, decision approving the Record of Decision and Construction and Operations Plan for the Sunrise Wind project, as arbitrary, capricious, and otherwise not in accordance with law;

202.   In the alternative, remand the Sunrise Wind ROD and COP to BOEM for reconsideration consistent with OCSLA § 8(p)(4) (43 U.S. Code § 1337(p)(4)) and the correct interpretation (M-37086 Memorandum reinstating M-37059 Opinion, May 1, 2025).

203.   Reasonable attorneys' fees and costs for bringing this suit; and,

204.   Such other and further relief as the Court deems appropriate.

Dated: March 24, 2026

Respectfully submitted,

*/s/ Thomas Stavola Jr. Esq.*
Thomas Stavola Jr. Esq.
DC Bar ID number: 90015331
Law Office of Thomas Stavola Jr. LLC
209 County Road 537
Colts Neck, NJ 07722
tstavolajr@stavolalaw.com
732-539-7244

*Counsel for Plaintiffs*